**GRANITE TRUST COMPANY,**
Plaintiff, Appellant,

v.

**UNITED STATES of America,**
Defendant, Appellee.

No. 5109.

United States Court of Appeals
First Circuit.
Nov. 30, 1956.

Melville F. Weston, Boston, Mass., Richard F. Barrett and Powers & Hall, Boston, Mass., on the brief, for appellant.

Grant W. Wiprud, Atty., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Anthony Julian, U. S. Atty., and Arthur I. Weinberg, Asst. U. S. Atty., Boston, Mass., on the brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

Granite Trust Company sued the United States in the federal court for the District of Massachusetts to recover an overpayment of income tax and declared value excess profits tax for the year 1943. From a judgment for the defendant the taxpayer has taken this appeal.

Many of the facts were stipulated. It is agreed that if taxpayer's losses realized upon its disposition in 1943 of certain shares of common stock of the Granite Trust Building Corporation (hereinafter called the Building Corporation) are entitled to be "recognized," then Granite Trust Company should recover in this action an overpayment in the sum of $57,-801.32, with interest according to law.

In 1928 the Building Corporation was organized by Granite Trust Company for the purpose of acquiring land and constructing an office building thereon to be occupied by the bank. The land and building cost over $1,000,000 and were financed through the purchase by the taxpayer bank of all the stock of the Building Corporation. The Building Corporation rented a portion of the premises to Howard D. Johnson Company for a rental of approximately $13,700 per year. This last-named corporation was in 1943 wholly owned by Howard D. Johnson, an individual. Neither Howard D. Johnson Company, nor Johnson, owned any stock in Granite Trust Company, and no shareholder or officer of Howard D. Johnson Company was a director in, or otherwise connected with, Granite Trust Company, though both Howard D. Johnson Company, and Johnson, were depositors in the taxpayer bank.

Beginning at least as early as 1936, the amount at which the stock of the Building Corporation was carried upon the taxpayer's books was subjected to continuous criticism by various banking authorities. As a result, the taxpayer wrote down the value of the stock on its books, but nevertheless the examining authorities continued to press for further annual reductions.

At some time prior to October, 1943, the taxpayer's management commenced the formulation of a plan to bring this issue to a close by the expedient of having Granite Trust Company purchase the real estate from the Building Corporation for $550,000, a fair current appraisal, after which the subsidiary Building Corporation was to be liquidated. The practical problem in the execution of this plan resulted from the fact that the distribution in the liquidation of the subsidiary corporation was expected to amount to something between $65 and $66 per share upon the shares of common stock in the Building Corporation for which the taxpayer had paid $100 per share. In thus contributing to the simplification of the corporate structure of the taxpayer as a holding company, an end deemed desirable by the Congress, Granite Trust Company naturally wanted to be assured that its prospective loss to be realized upon the liquidation of its subsidiary would lawfully be "recog-

nized" at once so as to be available as a tax deduction.

In order that this forthcoming loss upon its investment might not be denied recognition by § 112(b) (6) of the Internal Revenue Code of 1939,[1] the taxpayer, on advice of counsel, proceeded to divest itself of some of its shares of common stock in the Building Corporation by means of several purported sales and of a gift, the facts concerning which are as follows:

As of December 1, 1943, the outstanding capital stock of the Building Corporation, all owned by the taxpayer, consisted of 2,250 shares of preferred stock and 5,000 shares of common stock, the latter being the sole voting stock. On December 6, 1943, the taxpayer sold to, or went through the form of selling to, Howard D. Johnson Company 1025 shares of common stock of the Building Corporation, that being 20.5 per cent of the outstanding voting stock. Howard D. Johnson Company paid $65.50 per share, a total of $67,137.50, and delivered to the taxpayer its check for this amount, which was charged to the deposit account of Howard D. Johnson Company on December 6, 1943, and credited to the general funds of the taxpayer. On the same day the taxpayer surrendered to the Building Corporation certificates covering 1,025 shares of common stock, and the Building Corporation issued to Howard D. Johnson Company a new certificate for that number of shares, which

certificate was held by Howard D. Johnson Company until it was surrendered on December 17, 1943, in the course of the final liquidation of the Building Corporation.

At a meeting of the Building Corporation stockholders held on December 10, 1943, the taxpayer submitted a written offer to purchase the real estate for $550,000. The stockholders voted to accept this offer, and at the same meeting the following vote was taken:

"That if and when this Corporation shall receive $550,000, adjusted as provided in the vote with regard to the sale of the Corporation's real estate, this Corporation shall be completely liquidated, and after payment or provision for payment of all debts of, claims against and obligations of this Corporation, all of its remaining assets shall be distributed at such time or times to stockholders of record at such date or dates, and under and subject to such circumstances as the Board of Directors may determine, to the stockholders of the Corporation pro rata in accordance with the respective priorities of the outstanding shares of the Corporation, provided, however, that such liquidation and distribution shall be made and shall be entirely completed prior to December 30, 1943."

At the date of the foregoing corporate action by the Building Corporation,

---

1. "§ 112. Recognition of gain or loss—
 *     *     *     *     *

"(b) Exchanges solely in kind—
 *     *     *     *     *

"(6) Property received by corporation on complete liquidation of another. No gain or loss shall be recognized upon the receipt by a corporation of property distributed in complete liquidation of another corporation. For the purposes of this paragraph a distribution shall be considered to be in complete liquidation only if—

"(A) the corporation receiving such property was, on the date of the adoption of the plan of liquidation, and has continued to be at all times until the receipt of the property, the owner of stock (in such other corporation) possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and the owner of at least 80 per centum of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), and was at no time on or after the date of the adoption of the plan of liquidation and until the receipt of the property the owner of a greater percentage of any class of stock than the percentage of such class owned at the time of the receipt of the property; and * * *."
26 U.S.C.A. § 112(b) (6).

namely, December 10, 1943, Granite Trust Company was the legal and equitable holder of 3,975 shares (79.5 per cent) of the then outstanding 5,000 shares of common stock. Howard D. Johnson Company, which as above stated held a certificate for 1,025 shares of common stock, waived notice of the stockholders' meeting and did not attend. Taxpayer's 3,975 shares were the only shares represented and acting at the meeting.

Thereafter, on December 13, 1943, the taxpayer sold, or went through the form of selling, ten shares each of the common stock in the Building Corporation to Howard D. Johnson individually and to one Ralph E. Richmond, for a price of $65.50 per share. On the same day the taxpayer donated to the Greater Boston United War Fund two shares of the common stock of the Building Corporation. Johnson and Richmond duly paid by check for the shares they bought, and the taxpayer delivered to them and to the United War Fund certificates sufficient to cover the shares sold or donated, which certificates were held by Johnson, Richmond, and the United War Fund until surrendered by them on December 17 in the course of the final liquidation of the Building Corporation.

At no time after the making of the above sales and gift did the taxpayer acquire any additional common stock in the Building Corporation.

On December 15, 1943, the real estate was conveyed to the taxpayer by the Building Corporation, and the taxpayer paid the Building Corporation the price of $550,000, appropriately adjusted for local taxes, rentals and insurance. The real estate was thereby brought on to the taxpayer's books at a cost equivalent to current fair market value, thus satisfying the banking authorities.

On December 17, 1943, the Building Corporation called for retirement at par of its outstanding preferred stock and paid the taxpayer therefor the sum of $225,000. On the same day the Building Corporation paid a final liquidating distribution in the amount of $65.77 per share with respect to each share of its outstanding common stock, and all holders surrendered their certificates for such outstanding shares. The taxpayer, as the owner of 3,953 shares of common stock, received $259,988.81. The owners of the other 1,047 shares of the Building Corporation common stock received, respectively: Howard D. Johnson Company, $67,-414.25; Howard D. Johnson, $657.70; Ralph E. Richmond, $657.70; Greater Boston United War Fund, $131.54. Each payee received and retained these amounts.

On December 30, 1943, a final meeting of the Building Corporation stockholders was held, there being represented at the meeting the taxpayer, Howard D. Johnson Company, Howard D. Johnson, Ralph E. Richmond, and Greater Boston United War Fund. Dissolution was voted, with authority to the corporation's directors and officers to take all steps necessary or advisable to that end.

The taxpayer concedes that it would not have made the sales described above had it not been for § 112(b) (6) of the Internal Revenue Code of 1939. While the taxpayer maintains that the gift to the United War Fund was but part of the total gift to that organization for the year 1943, it seems clear, because this was the only case where shares of stock rather than cash were distributed to the charity, that at least the specific object given at this time was dictated by § 112(b) (6).

The precise issue before us is whether or not to give effect for tax purposes to the aforesaid sales and gift by the taxpayer. If the answer is in the affirmative, there is no doubt that the liquidation distribution of the property of the Building Corporation was not in "complete liquidation" within the very special meaning of that phrase in § 112(b) (6) of the 1939 Code, and, accordingly, the taxpayer may recognize the loss on its investment.

Although there is no dispute that the transactions in form at least purport to

be sales and a gift, the Commissioner nevertheless maintains that we should not accord them that significance. The Commissioner's argument is in two parts: The first proposition derives from the basic finding of the district court that the taxpayer effected the liquidation "in such manner as to achieve a tax reduction" and that this was "without legal or moral justification." The Commissioner attempts to bolster this argument by his traditional corporation reorganization analysis to the effect that, so long as the "end-result" of the transactions involved complies with the "criteria of the statute," intermediary steps (in this case the sales and gift) should be ignored as if they were nonexistent. His reasoning is that, if the final outcome is complete liquidation of a subsidiary corporation which at the outset was wholly owned by the taxpayer, the entire procedure comes within the intendment of the statute and "[c]ircuitous steps to avoid Section 112(b) (6)" occurring prior to the ultimate liquidation should be disregarded.

The Commissioner's second proposition is that there were *in fact* no valid sales or gift of stock made by the taxpayer. This argument rests on the taxpayer's admission that the transfers were motivated solely by tax considerations and were made in a friendly atmosphere to friendly people who knew of the decision to liquidate the corporation before the end of the year. As the Commissioner points out, the liquidation took place shortly after the transfers, and the transferees then received back the money they had paid in, plus a small profit. Therefore, the Commissioner argues, relying heavily on Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, that "the stock transfers in question had no independent purpose or meaning—either for the transferor or the transferees—but constituted merely a transitory and circuitous routing of legal title for the purpose of avoiding taxes, within the meaning of Gregory v. Helvering, supra. It was not expected or intended by any of the parties that the transferees should become true stockholders. Legal title passed; but beneficial ownership surely never passed. The transferees who paid money for their stock knew that the subsidiary would be liquidated in a few days and that they would get their money back— as in fact they did, with additional amounts to pay them for their cooperation in serving as conduits of title." The gift of stock to the United War Fund is dismissed as "nothing more than a gift of the cash."

The Commissioner also makes reference to carefully selected language from Griffiths v. Helvering, 1939, 308 U.S. 355, 357, 358, 60 S.Ct. 277, 84 L.Ed. 319, and Commissioner of Internal Revenue v. Court Holding Co., 1945, 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981, but these cases are factually remote from the one at bar.

Our conclusion is that the Commissioner's arguments must be rejected, and that the taxpayer should be permitted to "recognize" the loss on its investment, which it undoubtedly realized upon the liquidation of the Building Corporation.

Initially we may note, without ruling upon it, one legal argument made by the Commissioner having to do with the efficacy of the purported sale of 1,025 shares of stock to Howard D. Johnson Company on December 6, 1943. The Commissioner contends that, to satisfy the first condition of nonrecognition prescribed in § 112(b) (6), it is not necessary to have a formal plan of liquidation, evidenced by a corporate resolution, but it is sufficient if there is a "definitive determination" to achieve dissolution. It is claimed by the Commissioner that such a definitive determination existed here by November 10, 1943, and, therefore, that the sale of stock to Howard D. Johnson Company which took place on December 6, 1943 (before the formal adoption of the plan of liquidation) occurred *after* the "adoption of the plan of liquidation" within the meaning of § 112(b) (6). In this view the taxpayer owned 100 per

cent of the subsidiary's stock on the date the plan of liquidation was adopted, from which it would follow, on the basis of the first condition of § 112(b) (6), that the loss should not be "recognized."

We need not consider the foregoing legal argument on its merits, because the subsequent actions by the taxpayer —the sales to Johnson individually and to Richmond on December 13, 1943, and the gift of stock on the same day to the United War Fund—of themselves, if valid, successfully accomplished the taxpayer's purpose of avoiding the nonrecognition provisions of § 112(b) (6) under the second condition contained in that subsection. This second condition prescribes, in a sort of backhanded way, that gain or loss shall be recognized if, at any time on or after the date of the adoption of the plan of liquidation and prior to the date of the receipt of the property distributed in final liquidation, the receiving corporation is the owner of a greater percentage of any class of stock of the corporation being liquidated than the percentage of such stock owned by it at the time of the receipt of the property—which means that this condition precedent to the nonrecognition of a realized gain or loss is not satisfied if, in the described period, the receiving corporation has made an effective disposition of any of the shares of stock held in the subsidiary corporation, without making any countervailing acquisitions of such stock.

■■■ Turning then to the basic contentions of the Commissioner, not much need be said with reference to the proposition that the tax motive for the sales and gift rendered the transactions "immoral" and thus vitiated them. Again and again the courts have pointed out that a "purpose to minimize or avoid taxation is not an illicit motive." Sawtell v. Commissioner, 1 Cir., 1936, 82 F.2d 221, 222. The Gregory case itself makes this clear, Gregory v. Helvering, supra, 293 U.S. at page 469, 55 S.Ct. at page 267. To the same effect see Jones v. Grinnell, 10 Cir., 1950, 179 F.2d 873, 874.

■■■ As for the Commissioner's "end-result" argument, the very terms of § 112(b) (6) make it evident that it is not an "end-result" provision, but rather one which prescribes specific conditions for the nonrecognition of realized gains or losses, conditions which, if not strictly met, make the section inapplicable. In fact, the Commissioner's own regulations (Reg. 111, § 29.112(b) (6) ) emphasize the rigid requirements of the section and make no allowance for the type of "step transaction" theory advanced in this case.

■■■ The legislative history of § 112 (b) (6) likewise tends to support the position of the taxpayer. That history indicates that Congress was primarily concerned with providing a means of facilitating the simplification of corporate structures pursuant to the general policy enunciated in the Public Utility Holding Company Act of 1935, 49 Stat. 803, 15 U.S.C.A. § 79 et seq. See Seidman's Legislative History of Federal Income Tax Laws 240–43 (1938); Helvering v. Credit Alliance Corp., 1942, 316 U.S. 107, 112, 62 S.Ct. 989, 86 L.Ed. 1307. This fact, while perhaps not conclusive as to the proper interpretation of § 112 (b) (6), nevertheless does lend a favorable background to the taxpayer's contention that the subsection, as a relief measure, was "not designed as a strait jacket into which corporations should be forced at the penalty of forfeiture of losses on liquidation of subsidiaries."

The more specific and more important bit of legislative history is found in the Report of the Senate Finance Committee at the time that § 112(b) (6) was reenacted, with amendments, as § 332 of the Internal Revenue Code of 1954. At this time, when Congress was engaged in a comprehensive reexamination of the Internal Revenue Code, the well-known case of Commissioner of Internal Revenue v. Day & Zimmermann, Inc., 3 Cir., 1945, 151 F.2d 517, had been decided in favor of the taxpayer, and it

reasonably could be supposed that Congress, had it disapproved of the decision in that case, would have overturned its conclusion by making over § 112(b) (6) into an "end-result" provision. In the Day & Zimmermann case, the taxpayer, admittedly in order to avoid the nonrecognition provisions of § 112(b) (6), had sold at public auction a sufficient number of shares of a wholly owned subsidiary corporation to reduce its holdings below 80 per cent. These shares were bought, after general bidding, by the treasurer of the taxpayer, who, after receiving cash dividends in the subsequent liquidation of the companies, reported his gain and paid income tax thereon. The Third Circuit held that § 112(b) (6) did not apply to the liquidation, emphasizing that the treasurer had paid a fair price for the shares, had used his own money, had not been directed by anyone to bid, and that there had been no showing of any understanding existing between him and the corporation by which the latter was to retain any sort of interest in the securities or in the proceeds therefrom. See Avco Mfg. Co. v. Commissioner, 1956, 25 T.C. 975, to the same effect. Commissioner of Internal Revenue v. Day & Zimmermann, Inc., is not to be distinguished, as the Commissioner suggests, on the ground that the sale of stock was at public auction, without specific negotiation between the treasurer and the taxpayer. The significant thing in the case is its ultimate rationale that the purported sales of stock to the treasurer were in fact sales, notwithstanding the tax motive which prompted the corporation to enter into the transaction; from which it would seem to be irrelevant how the transfer was arranged, or whether or not it occurred at a public auction or exchange, so long as the beneficial as well as legal title was intended to pass and did pass.

Now, what did the Congress do in 1954 in view of Commissioner of Internal Revenue v. Day & Zimmermann, Inc., holding that a parent corporation contemplating the liquidation of a wholly owned subsidiary might elect, by making a transfer of an appropriate portion of the stock in the subsidiary, to avoid the conditions precedent to the nonrecognition of gain or loss prescribed in § 112(b) (6)? In reenacting that section in 1954, the Congress struck out the second condition, but left in the first condition which the taxpayer had successfully utilized in the Day & Zimmermann case in order to avoid a nonrecognition of a realized loss. This is what the Report of the Senate Finance Committee said at the time:

"Section 332. Complete Liquidations of Subsidiaries.

"Except for subsection (c) section 332 corresponds to and in general restates section 112(b) (6) of the 1939 Code and provides for the liquidation of a subsidiary corporation by its parent without the recognition of gain or loss to the parent corporation. Your committee has, however, deleted a provision which now appears in section 112(b) (6) (A) which removes a liquidation from the application of that section if the parent corporation at some time on or after the time of the adoption of the plan of liquidation and until the receipt of the property owns more stock than that owned at the time of the receipt of the property. Your committee has removed this provision with the view to limiting the elective features of the section." (Sen. Finance Committee Report, H.R. 8300, 83d Cong., 2d Sess. 255 (1954).)

The above reference to the "elective features" of the subsection seems inescapably to reflect a legislative understanding (admittedly not contemporaneous with enactment, however) that taxpayers can, by taking appropriate steps, render the subsection applicable or inapplicable as they choose, rather than be at the mercy of the Commissioner on an "end-result" theory. Nowhere in the subsection is there any express reference to an "election" or an "option," and the use of the word "elec-

tive" in the committee report therefore strongly indicates, as the taxpayer argues, that the committee believed that corporations could avoid the nonrecognition provisions by transfers designed to eliminate the specific conditions contained in the subsection.

We come then to the Commissioner's second major contention, resting on Gregory v. Helvering, supra, that the sales of stock by the corporation should be ignored on the ground that they were not bona fide, and that the taxpayer therefore retained "beneficial ownership". The Commissioner characterizes the transfers as artificial, unessential, transitory phases of a completed tax avoidance scheme which should be disregarded.

In answer to this contention, it is first necessary to determine precisely what the Gregory case held. Judge Learned Hand, in Chisholm v. Commissioner, 2 Cir., 1935, 79 F.2d 14, 15, 101 A.L.R. 200, certiorari denied 1935, 296 U.S. 641, 56 S.Ct. 174, 80 L.Ed. 456, analyzed the case as follows:

> "*The question always is whether the transaction under scrutiny is in fact what it appears to be in form;* a marriage may be a joke; a contract may be intended only to deceive others; an agreement may have a collateral defeasance. In such cases the transaction as a whole is different from its appearance. * * * In Gregory v. Helvering, supra, 293 U.S. 465, 55 S.Ct. 266 * * * the incorporators adopted the usual form for creating business corporations; but their intent, or purpose, was merely to draught the papers, in fact not to create corporations as the court understood that word. That was the purpose which defeated their exemption, not the accompanying purpose to escape taxation; that purpose was legally neutral. Had they really meant to conduct a business by means of the two reorganized companies, they would have escaped whatever other aim they might have had, whether to avoid taxes, or to regenerate the world." [Italics added.]

In the present case the question is whether or not there actually were sales. Why the parties may wish to enter into a sale is one thing, but that is irrelevant under the Gregory case so long as the consummated agreement was no different from what it purported to be.

Even the Commissioner concedes that "[l]egal title" passed to the several transferees on December 13, 1943, but he asserts that "beneficial ownership" never passed. We find no basis on which to vitiate the purported sales, for the record is absolutely devoid of any evidence indicating an understanding by the parties to the transfers that any interest in the stock transferred was to be retained by the taxpayer. If Johnson or Richmond had gone bankrupt, or the assets of both had been attached by creditors, on the day after the sales to them, we do not see how the conclusion could be escaped that their Building Corporation stock would have been included in their respective assets; and if Johnson or Richmond had died, surely the holdings of stock of each would have passed to his executors or administrators, or legatees.

In addition to what we have said, there are persuasive reasons of a general nature which lend weight to the taxpayer's position. To strike down these sales on the alleged defect that they took place between friends and for tax motives would only tend to promote duplicity and result in extensive litigation as taxpayers led courts into hairsplitting investigations to decide when a sale was not a sale. It is no answer to argue that, under Gregory v. Helvering, there is an inescapable judicial duty to examine into the actuality of purported corporate reorganizations, for that was a special sort of transaction, whose bona fides could readily be ascertained by inquiring whether the ephemeral new corporation was in fact transacting business, or

whether there was in fact a continuance of the proprietary interests under an altered corporate form. See Lewis v. Commissioner, 1 Cir., 1949, 176 F.2d 646.

What we have said so far is related chiefly to the validity of the sales. When we turn to the gift on December 13, 1943, to the United War Fund, the taxpayer is on even firmer ground. The Commissioner says that the gift was nothing more than a gift of cash, that the charity "was, at most, a passive transferee, without independent purpose, which held legal title to two shares for four days." This assertion rests, when examined closely, on the simple fact that the purpose for the gift was a tax avoidance one. But this does not disqualify it as an effective gift, transferring title. A gift certainly may have a tax motive. See Commissioner of Internal Revenue v. Newman, 2 Cir., 1947, 159 F.2d 848; Sawtell v. Commissioner, supra, 82 F.2d at page 222. Charitable contributions of low-cost securities are an every-day type of transfer motivated by tax purposes. The gift to the United War Fund, being valid, transferred two shares from the taxpayer after the adoption of the plan of liquidation, and alone sufficed to put the liquidation beyond the reach of the nonrecognition provisions of § 112(b)(6).

In short, though the facts in this case show a tax avoidance, they also show legal transactions not fictitious or so lacking in substance as to be anything different from what they purported to be, and we believe they must be given effect in the administration of § 112(b)(6) as well as for all other purposes. See Sun Properties, Inc., v. United States, 5 Cir., 1955, 220 F.2d 171; Hobby v. Commissioner, 1943, 2 T.C. 980.

A judgment will be entered vacating the judgment of the District Court and remanding the case to that court with direction to enter judgment for the plaintiff in the sum of $57,801.32, with interest.