**D. J. CAMPBELL CO., Inc.**

v.

**The UNITED STATES.**

No. 76–63.

United States Court of Claims.

Dec. 16, 1966.

Charles E. Prieve, Milwaukee, Wis., for plaintiff. John A. Meyer, Milwaukee, Wis., of counsel.

Edward B. Greensfelder, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

## OPINION

PER CURIAM.

This case was referred to the late Trial Commissioner Robert K. McConnaughey, with directions to make findings of fact and recommendation for conclusions of law. The commissioner did so in an opinion and report filed on November 10, 1965. Exceptions to the commissioner's findings and recommended conclusion of law were filed by the parties. The case has been submitted to the court on the briefs of the parties and oral argument of counsel. Since the court is in agreement with the opinion and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Therefore, plaintiff is not entitled to recover an amount of tax commensurate with the reduction of its taxable income for 1958 that would result from amortization, during 1958, as the cost of a depreciable intangible asset, of the amount it paid to Louis C. Martin in December 1957, but is entitled to recover an amount reflecting amortization, during 1958, of an appropriate portion of an unamortized residue of $3,714.50 of the original cost of the heyco contract, and judgment is entered to that effect with the amount of recovery to be determined pursuant to Rule 47(c).

Commissioner McConnaughey's opinion,* as modified by the court, is as follows:

In this suit the plaintiff asserts a claim for refund of an alleged overpayment of income taxes for 1958, on two alternative grounds.

Primarily it claims an overpayment resulting from the defendant's refusal to allow it to amortize, during 1958, a ratable portion of $54,565.18 it paid, on December 19, 1957, to Louis C. Martin, a former stockholder, as a result of which it acquired from Martin, pursuant to an option, title to a contract [1] it had

---

* The opinion, findings of fact and recommended conclusion of law are submitted under the order of reference and Rule 57 (a).

1. The contract, hereafter called the heyco contract, provided for an exclusive right to distribute, in 11 midwestern states, a patented form of strain relief bushing, called a "heyco," manufactured since 1947, or before, by the Heyman Manufacturing Company of Kenilworth, New Jersey.

A strain relief bushing is a device adapted to secure an electric cord at the point where the cord enters an electric ap-

transferred to Martin on October 16, 1957, as partial consideration for Martin's surrender of his stock.[2]

The plaintiff's alternate claim is that, if it is not entitled to amortize the cost of reacquiring the heyco contract from Martin in 1957, it is entitled to amortize, during 1958, part of a previously unamortized remainder of the original cost of acquiring the contract in 1956, and to recover an amount of tax commensurate with the consequent reduction of its taxable income for 1958.

The circumstances that led the plaintiff to acquire the heyco contract in 1956, to transfer it to Martin in October 1957, and to reacquire it from Martin about 2 months later, were incidents of a course of events that began on July 1, 1948, when the heyco contract was initiated between the Heyman company and D. J. Campbell, then doing business in Milwaukee, Wisconsin, as an individual, under the name of D. J. Campbell Co.

The heyco contract obligated the Heyman company to provide sufficient heycos to fill all of Campbell's orders at prices to be agreed upon that would not exceed 90 percent of the lowest current list prices for comparable sizes of heycos. The contract's original term was 10 years from July 1, 1948, but it contained a provision for renewal at the end of that period—

* * * for one additional period of five (5) years unless Campbell gives written notice of his intention not to renew * * * at least six (6) months before the termination of the original ten year period.

The Heyman company had the right to terminate the contract (a) at the end of any calendar year in which Campbell failed to purchase designated minimum amounts of heycos, running from 2 million in 1948 to 5 million in each year after 1950, and (b) on 3 days' written notice at any time after Campbell filed a petition in bankruptcy or was adjudicated a bankrupt, or made any assignment for the benefit of creditors to take advantage of any insolvency act.

In addition to selling heycos under the contract, Campbell also distributed other products of the Heyman company, and sold insulated wire.

Among Campbell's employees were Philip R. Glaser, now president of the plaintiff, who was employed early in 1949, primarily to promote the sale of heycos, and Louis C. Martin, who was originally employed about 1947, and whose principal job was to sell wire.

Under Campbell's direction, Glaser and Martin were both good at their separate jobs, in part because they had quite different and, as later developments proved, mutually incompatible temperaments.[3]

---

pliance, in a manner which (1) prevents the cord from being pulled loose, accidentally, from its connections within the appliance, and (2) minimizes wear and tear on the cord at the point where it enters the appliance.

Heycos, made of a plastic material, under patents which include an improvement patent issued March 29, 1960, have been widely used by manufacturers of electric appliances as an acceptable form of strain relief bushing, and have furnished the plaintiff and the Heyman company a volume of business which both companies have regarded as satisfactory. During 1957, about 95 percent of the plaintiff's sales represented sales of heycos.

2. Between October 16 and December 19, 1957, the plaintiff continued its distribu-

tion of heycos in accordance with the terms of the heyco contract, without interruption, under a license from Martin, granted as part of the transaction whereby he acquired title to the contract on October 16, 1957.

3. Martin was successful in selling wire. Wire was largely a standard product, competitively priced, and was sold principally by maintaining a friendly clientele and inducing purchases on the basis of minor price advantages or other considerations which did not involve technical differentiation between the wire offered by Campbell and that available from other sources.

The selling of heycos, at which Glaser was successful, required persuasion of engineers, representing potential purchas-

Campbell became ill in January of 1956 and, for several months in 1956, Glaser and Martin operated the business under a power of attorney executed by Campbell during the spring of that year.

Campbell died on July 27, 1956. Thereafter, until September 14, 1956, Glaser and Martin continued to operate the business, as coadministrators of Campbell's estate, under appointment by the probate court.

On September 14, 1956, they purchased the business assets of the Campbell estate, including the heyco contract, for $50,000 and the assumption of certain liabilities.

The probate court's order directed the transfer to Glaser and Martin of only tangible property appraised at $39,948.90 and the heyco contract, which had not been appraised.[4] Insofar as this record shows, the original cost of the heyco contract to Glaser and Martin was in the neighborhood of $10,051.10, the balance of the $50,000 cash purchase price they paid for the Campbell assets that is not accounted for by the $39,948.90 appraised value of the tangible assets they received.

The plaintiff corporation was formed on September 14, 1956, the same day Glaser and Martin acquired the heyco contract from the Campbell estate.[5] Glaser was president and held 100 shares of the stock. Martin was vice president and also held 100 shares.[6]

Glaser and Martin did not transfer the assets they had acquired from the Campbell estate to the plaintiff until sometime in October 1956. Meanwhile they operated the business as a partnership.

When the plaintiff received the Campbell assets, it retained the inventory of heycos, the heyco contract, and office and warehouse equipment needed to conduct the business of selling heycos, and contributed the insulated wire inventory and the remaining office and warehouse equipment to its wholly owned subsidiary, Martin-Gaertner Sales, Inc.

The diverse temperaments of Glaser and Martin soon led to disagreements between them about the management of the business. Their differences increased until, on September 12, 1957, at a meeting of the plaintiff's board of directors (which Heyman did not attend), Glaser read a prepared statement in which he contended that the business could not continue under the conditions that prevailed. No action was taken at the meeting to resolve the difficulties, but, from that time on, Glaser persistently sought means to achieve two specific, coordinate objectives: (1) to exclude Martin from ownership of any interest in the plaintiff and from active participation in its management, and (2) to assure the plaintiff's retention of the right to sell heycos on the terms provided in the heyco contract.

During the rest of September 1957, Glaser and Martin had numerous discussions, in a fruitless effort to settle their disputes. These included discussions in New Jersey with officials of the Heyman company, late in September.

ers, that heycos were technically preferable to other forms of strain relief bushings for use in electrical equipment made, or proposed to be made, by the prospective customers.

4. It also required them to collect the accounts receivable of the business and to pay the amounts collected to the executor, and to satisfy certain contingent liabilities for returns and allowances and for shortages in consigned inventories. The evidence does not show the value or the burden of these responsibilities and liabilities.

5. On the same day they formed another corporation, called Martin-Gaertner Sales, Inc., as a wholly owned subsidiary of the plaintiff, to handle the wire business. The plaintiff paid $500 for all of the Martin-Gaertner stock.

6. Three additional shares, callable at the will of the plaintiff were issued—one to Charles E. Prieve, the plaintiff's secretary and attorney, one to William H. Murray, the plaintiff's accountant, and one to Horace W. Heyman, the president of the Heyman company, hereafter called Heyman.

Shortly after he returned to Milwaukee from New Jersey, Martin asked Prieve, the plaintiff's attorney, to prepare a plan for segregating Martin's and Glaser's interests in the enterprise. Prieve drafted such a plan and mailed a copy to Heyman on October 1, 1957.

In summary, Prieve's plan provided for:

1. Purchase of 16 of Martin's 100 shares of the plaintiff's stock, by the Heyman company from Martin, for $16,000;

2. Surrender of Martin's remaining 84 shares to the plaintiff in exchange for (a) all of the Martin-Gaertner stock (valued on the books at $8,000), (b) $6,000 in cash, and (c) the heyco contract;

3. Purchase by the Heyman company from the plaintiff, for $6,300, of the 84 shares of stock redeemed by the plaintiff;

4. Exercise by Martin of the right to extend the heyco contract for 5 years, to June 30, 1963; and

5. A license, from Martin to the plaintiff, authorizing the plaintiff to sell heycos under the contract in exchange for monthly payments based on a percentage of heyco sales until $70,000 had been paid, whereupon no further payments to Martin would be required and he would reassign the contract to the plaintiff.

Glaser rejected the Prieve plan of October 1, 1957. He wanted nothing further to do with Martin. He objected to Martin's having the heyco contract and to the requirement that the plaintiff pay Martin royalties in order to continue selling heycos, even though the contract would revert to the plaintiff when $70,000 had been paid to Martin. Glaser said that, if Martin held the heyco contract, he would be virtually working for Martin, and that he did not care to do.

Another meeting was held in Milwaukee on October 15, 1957, in a further effort to devise some generally acceptable plan for separating Martin's and Glaser's interests in a way that would enable the plaintiff to continue to sell heycos under Glaser's direction, free of the dissension within its management which all concerned had come to regard as detrimental to its prospects of continued success.

Heyman attended the meeting, accompanied by Robert R. Mandel, a certified public accountant who was Heyman's advisor on all financial matters, including taxes.

The meeting was characterized by strenuous negotiations. Numerous and varied proposals were exchanged in an effort to devise a plan that would meet Glaser's and Martin's conflicting demands, and satisfy Martin's shifting estimates of the value of his interest. Among these was a proposal developed by Martin and Heyman in a separate conference, outside the principal meeting room. Martin was demanding $100,000 for his interest. Heyman suggested $50,000 as a suitable figure. Martin and Heyman agreed between themselves on a compromise whereby the Heyman company would get Martin's half of the plaintiff's stock for $75,000 and Martin would be out completely. For reasons not disclosed by the record, this proposal, among others, was not generally agreed upon by the meeting.

After much discussion, Martin said he would be willing to surrender 70 shares of his stock to the plaintiff in exchange for the heyco contract, but Glaser said the plaintiff could not continue in operation "unless there were some licensing agreement to the contract."

The meeting continued throughout the day of October 15. During the evening, Prieve and Mandel prepared a draft of corporate minutes to record the results of the day's negotiations, and agreements to implement the plan described in the minutes.

In summary, the plan included the following provisions:

1. The Heyman company would acquire 30 of Martin's shares of the plaintiff's stock directly from Martin for $24,600;

2. There would be a partial liquidation of the plaintiff, whereby, in exchange for the heyco contract and the Martin-Gaertner stock, Martin would pay the plaintiff $500 and surrender his remaining 70 shares of stock to the plaintiff for cancellation;

3. Glaser would contribute 70 of his 100 shares to the capital of the plaintiff to complete the partial liquidation;

4. Martin would exercise the right to extend the heyco contract for 5 years, to June 30, 1963, and would grant the plaintiff an exclusive license to sell heycos in accordance with the contract, in exchange for the plaintiff's agreement to pay Martin 5 percent of its net sales of heycos;

5. Martin would resign as vice president and director of the plaintiff and would agree not to compete with the plaintiff in the sale of strain relief bushings for a period not exceeding 2 years; and

6. Various other provisions designed to adapt the plaintiff's operations to functioning under the revised structure.

Glaser refused to sign the proposed license agreement unless it contained an option granting the plaintiff the right to reacquire the heyco contract from Martin within a specified period, and the license agreement, as finally signed on October 16, 1957, included the following provision—

For a period of ninety (90) days from October 16, 1957 the Campbell Co. shall have an option to purchase the contract of July 1, 1948 for a price equal to $57,400.00 less the amount of any royalties paid prior to the date of the exercise of the option. If such option is exercised, upon receipt of the cash price, Licensor shall deliver to the Campbell Co. a complete assignment of all of his right, title, and interest in and to said contract of July 1, 1948 as well as any further rights under this contract.

By these transactions, Glaser substantially achieved both his objectives, despite the necessity of transferring the heyco contract to Martin. (1) Martin's ownership interest in the plaintiff was wholly eliminated and he was excluded from any active participation in its management, and (2) the plaintiff's right to continue to sell heycos under the terms of the heyco contract was substantially assured. All it had to do to retain that right was to make the 5 percent monthly payments to Martin that were required by the license and avoid termination of the contract or the license by continuing to sell the required minimum quantities of heycos each year and by avoiding bankruptcy and any assignment under an insolvency act.[7]

Nevertheless Glaser was determined that the plaintiff should retrieve title to the contract by exercising the option if he could possibly get the money to do so. His reasons are not altogether clear, but apparently they included a desire to avoid paying Martin the monthly royalties and a desire to protect the plaintiff against any risk of some capricious attempt by Martin to sell the heyco contract to someone else, or to attempt to perform it himself.

Glaser and Prieve each discussed with Heyman and Mandel, while they were in

---

7. As will be explained in more detail hereafter, the transfer of the heyco contract to Martin was made essentially as security for the plaintiff's performance of its undertaking to pay Martin, as part of the consideration he demanded for his stock, either 5 percent of its heyco sales over a 5½-year period or, at the plaintiff's option, $57,400 within 90 days, less any amounts previously paid as royalties under the license.

Milwaukee in October, the prospect that the plaintiff would not have enough money of its own within 90 days to exercise the option. They did not directly request a loan to enable the plaintiff to take up the option but their comments were designed to afford Heyman and Mandel an opportunity to offer to make such a loan.

Heyman was favorably disposed to Glaser, and anxious to have the plaintiff succeed under his management. He may even have offered Glaser financial assistance, if it should be needed, to further the plaintiff's success.[8]

There is no evidence, however, that either Heyman or Mandel made any promise in October 1957 that the Heyman company would lend the plaintiff the amount necessary to exercise the option. On the contrary, Heyman and Mandel left both Prieve and Glaser with the impression that they intended to postpone any decision about the option until they had a chance to observe the plaintiff's operations under the new arrangement.[9]

The evidence affords far more reason for believing that Heyman and Mandel genuinely wished to have more assurance that the plaintiff would be successful under Glaser's management than they had in October 1957 before they committed the Heyman company to advance $55,000 to exercise the option, than it does for believing that they gave any covert assurance in October that the Heyman company would make such a loan.[10]

Shortly after the October meeting, Prieve attempted to arrange for a Milwaukee bank to lend the plaintiff the amount necessary to exercise the option but was turned down.

On October 22, 1957, Mandel wrote a note to Heyman reminding him to inquire, on December 10, "about payment of $55,000.00 to Campbell so that we exercise the opportunity of buying back the Heyco contract from Louis C. Martin."

During November and December 1957, the plaintiff paid Martin $2,834 under the licensing agreement, based on 5 percent of its net sales of all Heyman company products during the last half of October and all of November.

As far as this record shows, nothing more happened about the option until De-

8. Obviously the Heyman company's interest in the plaintiff's success was buttressed by selfish motives. The plaintiff was an established outlet for heycos throughout the territory defined in the heyco contract. The plaintiff's continued success would avoid any necessity for drastic readjustments in the arrangements for distribution of heycos in that area. Moreover the Heyman company's newly acquired 50-percent ownership of the plaintiff afforded it the favorable prospect of realizing, not only a profit, as manufacturer, on heycos it sold to the plaintiff, but half of all profits on heycos it sold to the plaintiff might realize through their resale, as well as half of its profits on any other business it might do.

9. The record fails to disclose any persuasive reason why the Heyman company should have been anxious to commit itself to a loan to enable the plaintiff to exercise the option, except perhaps to eliminate the royalties. Operating under the license, the plaintiff could continue with the sale of heycos as freely as it could if it owned the contract and, aside from the impact of the 5-percent royalty on the plaintiff's net income (and on the Heyman company's income as half owner of the plaintiff), the Heyman company would realize as much from the plaintiff's operations under the license as it would if the plaintiff owned the contract. Moreover it would do so without risking a substantial loan to a company that was just commencing to operate under a new and relatively untested management.

10. The record fails to indicate that tax considerations substantially affected any of the actions of Glaser or the Heyman company with regard to the heyco contract. Even if tax consequences were considered, it is far from clear that the possibility of treating amounts paid to Martin under the license as deductible expense might not have been regarded as substantially offsetting any tax advantage the plaintiff (and the Heyman company, as a 50-percent stockholder of the plaintiff) might have hoped to achieve by claiming amortization of a stepped-up basis for the heyco contract.

cember 11, 1957. On that date the plaintiff's board of directors authorized the exercise of the option and the borrowing of $55,000 from the Heyman company, and Glaser wrote to Heyman requesting the loan. Apparently they also communicated less formally, for, on the same day, the Heyman company's board of directors authorized a loan of $55,000 to the plaintiff.

Notes totaling $55,000 were signed on behalf of the plaintiff on December 16th, and on December 19th, the plaintiff exercised the option and Martin assigned the contract to the plaintiff "in consideration of the payment to Louis C. Martin of $54,565.18."

■ The evidence that discloses the transactions described above does not sustain the plaintiff's principal claim that the $54,565.18 it paid Martin in December 1957 to reacquire the heyco contract was the cost of acquiring a depreciable intangible asset—that it is entitled to amortize that cost over the 5½ years of life that remained in the heyco contract—and that $11,480.04 is deductible from its income for 1958 as a ratable share of the total amortizable depreciation.[11]

■ This is not because the rights established by the heyco contract do not constitute a depreciable intangible

asset within the meaning of the statute and the regulations. They do.

■ Nor is it because the plaintiff's transfer and reacquisition of the heyco contract was a sham transaction, carried out through a covertly prearranged plan. The evidence shows that it was not.

It is because the $54,565.18 the plaintiff paid to Martin in December 1957 was not paid to acquire any rights established by the heyco contract which might constitute an asset of use in the plaintiff's business and in the production of income. The plaintiff already had, through the license, all of the operative rights under the heyco contract. In its true substance, the payment was made to satisfy an obligation the plaintiff had incurred, in October 1957, to pay Martin in cash for his stock by either of two kinds of deferred payments.

The reasons for these conclusions are disclosed by a summary analysis of the facts of this particular case.

■ Beyond their recognition and consistent confirmation of the established principle that, in adjudging the effect of transfers of property on tax liabilities, the courts look beyond the form of the transaction to its substance, the cases cited by the parties, and others in this general field, are limited by their own

---

11. 26 U.S.C. (I.R.C.1954) § 167 (1958 ed.) provides:

§ 167. *Depreciation.*
(a) *General rule.*—
There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
(1) of property used in the trade or business, or
(2) of property held for the production of income.
\* \* \* \* \*
The applicable regulation is found in 26 C.F.R. § 1.167(a)–3 (1961 ed.), Treasury Regulations on Income Tax (1954 Code), which provides:
*Intangibles.*
If an intangible asset is known from experience or other factors to be of use

in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. For rules with respect to organizational expenditures, see section 248 and the regulations thereunder. For rules with respect to trademark and trade name expenditures, see section 177 and the regulations thereunder.

particular facts, to which they apply variations of that underlying principle.[12] In view of the controlling effect of factual distinctions on the tax consequences of individual transactions, there seems to be little point in interlarding this opinion with a multiplicity of citations of only tangential relevance to particular points of the analysis on which it rests. Within the general principle that substance, rather than form, determines the tax consequences of property transfers, the answer to the plaintiff's principal claim appears from an objective analysis of the evidence.

The heyco contract was an intangible asset. The rights it established were of use in the plaintiff's business and in the production of income. Those rights were available for only a limited period of time, the length of which was fixed by the terms of the contract itself and therefore need not be estimated. It conforms with the statutory definition of depreciable intangible property.

It is true, as the defendant says, that the heyco contract was not automatically productive of income. Few contracts are. Neither are patents or licenses under patents—or exclusive franchises to produce materials from designated, exhaustible sources, or to provide public service for defined periods—or even licenses to exercise rights under a contract such as the license the plaintiff here had from Martin. In common, such arrangements accord primarily a right to exploit an opportunity for the production of income, although they may also provide facilities for doing so. To the extent the opportunity accorded is exclusive, the likelihood of realizing income by its exploitation may involve less risks of failure than the exercise of a nonexclusive right to compete with others having similar rights. But even an exclusive right, whether granted by contract or otherwise, is in essence a license to try to realize income through the application of effort, and competence, and perhaps physical and financial resources in pursuit of an established and defined opportunity.

Where the opportunity granted is limited as to time—whether by the terms of the grant, as it was here, or by some

12. See and compare, Commissioner of Internal Revenue v. Brown, 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965); Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945); Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406 (1940); Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); Juniper Investment Co. v. United States, 338 F.2d 356, 168 Ct.Cl. 160 (1964); Ingle Coal Corp. v. United States, 127 F.Supp. 573, 131 Ct.Cl. 121, cert. denied, 350 U.S. 842, 76 S.Ct. 82, 100 L.Ed. 751 (1955); Guinness v. United States, 73 F.Supp. 119, 109 Ct.Cl. 84 (1947), cert. denied, 334 U.S. 819, 68 S.Ct. 1083, 92 L.Ed. 1749 (1948); Campbell v. Carter Foundation Production Co., 322 F.2d 827 (5th Cir. 1963); United States v. General Geophysical Co., 296 F.2d 86 (5th Cir. 1961), cert. denied, 369 U.S. 849, 82 S.Ct. 932, 8 L.Ed.2d 8 (1962); United States v. Mattison, 273 F.2d 13, 83 A.L.R.2d 706 (9th Cir. 1959); Granite Trust Co. v. United States, 238 F.2d 670 (1st Cir. 1956); Commissioner of Internal Revenue v. Transport Trading & Terminal Corp., 176 F.2d 570 (2d Cir. 1949), cert. denied, 338 U.S. 955, 70 S.Ct. 493, 94 L.Ed. 589, rehearing denied, 339 U.S. 916, 70 S.Ct. 566, 94 L.Ed. 1341 (1950); Commissioner of Internal Revenue v. Ashland Oil & Refining Co., 99 F.2d 588 (6th Cir. 1938), cert. denied, 306 U.S. 661, 59 S.Ct. 790, 83 L.Ed. 1057 (1939); and Kimbell-Diamond Milling Co. v. Commissioner, 14 T.C. 74 (1950), aff'd per curiam, 187 F.2d 718 (5th Cir. 1951), cert. denied, 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626 (1951).

None of these cases deals with facts directly comparable to those in this case and not all, or even a majority of them, deal with a legal issue identical to the one present here; indeed, the courts, in the cases cited, even place different nomenclature on the legal concepts upon which they base their decisions. They make it clear, however, that, whatever the facts and whatever the form, the courts seek to penetrate deeply into the transaction and to base their conclusions on a measure of the substantiality of the form against the facts. If, upon careful analysis, the form and the substance of the transaction are equal, the facts are determinative. For reasons elaborated hereafter, the facts of this case control the decision.

other ascertainable factor, such as the expiration of a predictable market or the exhaustion of some quantity of physical resources capable of approximate estimation—such value as the rights may have at the beginning decreases as the time passes during which they are available and the date approaches when the opportunity they afford to earn income will no longer exist.

In this sense the heyco contract was an exhausting, intangible asset, useful in the plaintiff's business for the production of income. It conveyed the opportunity to make money by granting an exclusive right, good until June 30, 1963, to buy heycos at an advantageous price and resell them throughout a designated territory.

■ The defendant contends, however, that the term of the heyco contract was indefinite and could not be estimated with reasonable accuracy because, in 1957, the Heyman company was disposed to agree to extend the contract indefinitely as long as it believed the plaintiff was likely to produce satisfactory results as an outlet for heycos.

The likelihood that the heyco contract would be extended without change upon its expiration was pure conjecture in 1957. The possibility, or even the probability, that it might be extended does not override the fact that neither the plaintiff nor the Heyman company had any obligation to extend it, or any right to an extension. At any time during the 5½ years the contract had to run, either the plaintiff or the Heyman company could have decided against continuing the existing arrangement beyond June 30, 1963, and there would have been nothing the other could have done to require an extension. In December 1957, none of the terms of any arrangements for selling heycos in the contract territory after June 30, 1963, were fixed. All were subject to negotiation at the instigation of either party. There was no assurance that the existing arrangement would be continued after June of 1963 on any terms.

The fact that, as matters stood between October and December 1957, the rights established by the contract would end on June 30, 1963, not only legally, but as a practical matter, is confirmed by the inference, compelled by all the evidence here, that any arrangement the Heyman company might have been willing to make for the sale of heycos after June 30, 1963, would have been made with the plaintiff, under a new contract, and not with Martin, by means of an extension of the existing contract, which he then held, and would continue to hold until the end of the contract's term if the plaintiff should not exercise the option.

For the reasons summarized above, the evidence does not support the defendant's contention that the heyco contract was not a depreciable intangible asset within the definition of the statute and the Treasury regulations.

Neither does the evidence support the defendant's contention that the plaintiff's reacquisition of the contract was the culmination of a perfected plan or agreement that existed when the contract was transferred to Martin in October. Glaser had hoped to retain the contract when Martin surrendered his stock. Failing that, he hoped to reacquire the contract within the option period. But neither he nor the plaintiff had the funds to do either. Nor did they have any assurance that the necessary funds would be available from any source in time to exercise the option. Heyman and Mandel had made it clear that the Heyman company was going to wait to see how things went before deciding whether to lend the amount needed. The record affords no persuasive reason to doubt that their representation reflected their intention. Indeed, the evidence suggests ample reasons why the Heyman company might have had no interest in ever financing the plaintiff's exercise of the option. Obviously the plaintiff had no reliable assurance that funds would be forthcoming from the bank that, shortly afterwards, denied its request for a loan. In summary, in October 1957, Glaser and the plaintiff had nothing more than a

hope that they could raise the funds they needed in order to exercise the option before the middle of January 1958 when it would expire.

The evidence affords no basis for substantial doubt that the plaintiff's transfer of the contract to Martin and its later reacquisition through exercise of the option were bona fide transactions, the form and substance of which were dictated by circumstances which neither Glaser nor the plaintiff could wholly control.

The trouble with the plaintiff's position is more subtle, but no less fundamental, than the lack of a depreciable asset or the existence of what would have amounted essentially to a sham transaction if the Heyman company had already been covertly committed to finance the exercise of the option at the time when the contract was transferred to Martin.

The trouble with the plaintiff's principal claim is that, when the plaintiff reacquired title to the heyco contract from Martin in December 1957, it acquired from him no right or property that was useful in its business or in the production of income. It already had all rights useful in its business and in the production of income that were conveyed by the heyco contract. It had them under the license, which it had held continuously from the time it transferred the contract to Martin in October. During the period between October 16 and December 19, 1957, it could do everything authorized by the heyco contract that it could have done if it had retained title to the

contract during that period, and everything it could do after it got the contract back in December. Martin had no operating rights under the contract at any time, and he transferred no such rights when he retransferred the contract to the plaintiff in December of 1957.

█ The basic reason for this lies in the nature of the transaction that occurred in October. That transaction preordained that its sequel in December would be the redemption of security given to assure the future payment of a deferred obligation and not a transfer of operating rights under the heyco contract.

At the time of the October meeting, the plaintiff did not have enough money of its own to buy Martin's stock outright, at any price he was willing to accept.[13]

For this reason, the elimination of Martin's stock interest had to be arranged some other way.

The arrangement agreed upon was that 30 shares of Martin's stock would be bought by the Heyman company and paid for outright, and that the other 70 shares would be transferred to the plaintiff and paid for, partly by an unconditional transfer of the Martin-Gaertner stock and partly by deferred payments of cash, either in monthly installments over a 5½-year period, equal to 5 percent of the plaintiff's heyco sales,[14] or within 90 days, as a cash payment of $57,400 under the option, less any royalties previously paid.

13. If it had, this case probably never would have arisen. The plaintiff would have paid Martin cash for his stock in October and retained the heyco contract. There would have been no transfer of the contract to Martin then and no reacquisition of it by the plaintiff in December. As a consequence, there would have been no ostensible basis for any claim that the amount paid to Martin in December was paid to acquire a depreciable asset. It would have been quite clear that the amount paid to Martin was paid for his stock. But so it was in the actual transaction whereby the plaintiff reacquired

the contract in December. There, too, the money was paid, not for the contract, but for the stock. By making the payment, the plaintiff merely satisfied and extinguished its obligation to pay for the stock and redeemed the contract which Martin had held as security to assure the making of deferred payments the plaintiff had agreed to make for the stock.

14. If these payments had been continued throughout the 5½ years until June 30, 1963, at the average rate of the payments made for November and half of October 1957, they would have totaled in the neighborhood of $125,000.

The other elements of the transaction, including the assignment of the contract to Martin, were all designed either to secure the making of these payments or to facilitate them.

The title to the contract was transferred to Martin solely as security for the deferred payments. He acquired none of the current operating rights provided for by the contract. The operating rights remained with the plaintiff by virtue of the license. Martin acquired only a contingent right to intervene in case the plaintiff should fail to make the required payments or to fulfill the minimum conditions required by the contract itself to avoid its termination. These are typical rights of a secured creditor. They were the only rights Martin ever had.

The plaintiff, on the other hand, retained all the rights and opportunities afforded by the contract to sell heycos. Thereby it was enabled to earn the money to make the periodic payments Martin had exacted as the price of his stock. This part of the arrangement, too, is typical of provisions for assuring the deferred payment of a secured obligation.

The option gave the plaintiff the right to pay in advance of the recurring due dates of its principal obligation—to curtail its liability to make the periodic payments by making an earlier, lump-sum payment. By exercising the option, it might fully satisfy the price Martin had demanded for his stock. By doing so, it could extinguish its obligation to continue making monthly payments and redeem the contract which Martin held as security for the monthly payments.

The plaintiff elected to exercise the option. The $54,565.18 it paid under the option was not made to purchase the contract. Coupled with the $2,834.82 already paid under the license, it constituted payment of the plaintiff's obligation to pay Martin the price he wanted for his stock. His retransfer of the contract when the payment was made was merely the relinquishment of the security he held to assure that the stock would be paid for in one or the other of the two ways provided for under the plan.

As indicated above, the security rights Martin relinquished when he retransferred the contract did not include any operating rights useful in the plaintiff's business or in the production of income. The formal retransfer of the contract merely extinguished Martin's contingent right as a creditor to intervene if the plaintiff should fail to make the monthly payments under the license, or should fail to sell at least 5 million heycos a year, or to avoid bankruptcy.

In sum, it was highly probable that plaintiff would exercise the option within the 90 days, and therefore Martin had, from the beginning, only a minimal connection with, and only a security interest in, the assigned contract. On those facts the case falls within the area marked out by United States v. General Geophysical Co., 296 F.2d 86 (C.A. 5, 1961), cert. denied, 369 U.S. 849, 82 S.Ct. 932, 8 L.Ed.2d 8 (1962).

Thus the $54,565.18 the plaintiff paid Martin in December 1957 was not the cost of acquiring a depreciable asset. It was a deferred payment for Martin's stock and may not be amortized under the provisions of the statute and the regulations on which the plaintiff relies.

■ The plaintiff's alternate claim of a right to amortize, during 1958, a previously unamortized remainder of the original cost of acquiring the contract in 1956 rests on a sounder basis.

As indicated above, the operating rights under the heyco contract constituted an intangible asset, useful in the plaintiff's business and in the production of income, and the cost of acquiring such rights may be amortized under the applicable statute and the regulations.[15]

The plaintiff had not fully amortized the cost of the contract before 1958.

Glaser and Martin paid $10,051.10 to the Campbell estate for the contract on

---

15. See footnote 11, supra.

September 14, 1956, after they had used it for approximately 1½ months while they were managing the business as co-administrators of Campbell's estate.

After they acquired the Campbell business assets on September 14, 1956, they continued to operate the business as a partnership for about a month and then, in October 1956, transferred the contract to the plaintiff, along with the other assets they had bought from the Campbell estate.

Thereafter the plaintiff utilized the contract as the basis for its business in heycos throughout the remainder of its extended term.

For 1956 and 1957, the plaintiff treated the contract as having a basis equivalent to its original cost to Glaser and Martin of $10,051.10. This basis was reduced by $655.50 for 1956 at the rate of $437 a month for 1½ months, for the period from July 27 to September 14, 1956, when the business was run by Glaser and Martin under direction of the probate court. This reduction in basis was computed as 3/46 of $10,051.10, assuming a useful life of 23 months ending with the original terminal date of the contract on June 30, 1958.

Thereafter the plaintiff took $1,529.60 as amortization for 3½ months during 1956, at the rate of $437 a month for the period from September 14 to December 31, 1956. This apparently included the period of approximately a month, from September 14 to sometime in October 1956, during which Glaser and Martin ran the business as partners, after the corporation was formed but before they transferred the Campbell assets to it.

For 1957 the plaintiff claimed amortization of $4,151.50, at the rate of $437 a month for 10½ months from January 1 to October 15, 1957, when the contract was transferred to Martin.[16]

This left $3,714.50 of the original cost unamortized. The plaintiff is entitled to amortize, during 1958, an appropriate portion of this unamortized residue of the contract's original cost, and judgment should be entered to that effect.[17]

The amount of recovery should be determined through proceedings under Rule 47(c).

16. The plaintiff's representation of the amortization, previously claimed on the basis of the original cost of the heyco contract, is reflected in the following tabulation:

| | |
|---|---:|
| Original cost | $10,051.10 |
| Amortization 1½ months in partnership—(Useful life 23 months —July 27–Sept. 14, 1956 or 3/46 of $10,051.10 at $437 per month) | 655.50 |
| Basis of contract on books of corporation | 9,395.60 |
| Amortization 3½ months—(Sept. 14–Dec. 31, 1956 at $437 per month) | 1,529.60 |
| Remaining basis Jan. 1, 1957 | 7,866.00 |
| Amortization 8 months—(Jan. 1, 1957–Aug. 31, 1957 at $437 per month) | 3,496.00 |
| Remaining basis Sept. 1, 1957 | 4,370.00 |
| Amortization 1½ months—(Sept. 1, 1957–Oct. 15, 1957 at $437 per month) | 655.50 |
| Remaining basis Oct. 15, 1957 | 3,714.50 |

7. The plaintiff has urged, in addition, a claim based on an alleged right to deduct from its income for 1958 the amount of any additional bonus payable to its president for 1958 that might be attributable to increased profits in 1958 resulting from denial or reduction of its amortization of the cost of the heyco contract. This liability, however, will not be fixed and definite until this court's decision becomes final; therefore the taxpayer cannot take a deduction for this additional bonus in 1958. United States v. Consolidated Edison Co., 366 U.S. 380, 81 S. Ct. 1326, 6 L.Ed.2d 356 (1961).