Kimball Farms, Inc. v. Commissioner.
Kimball Farms, Inc. v. Commissioner
Docket No. 5053-66.
United States Tax Court
T.C. Memo 1967-231; 1967 Tax Ct. Memo LEXIS 29; 26 T.C.M. (CCH) 1180; T.C.M. (RIA) 67231; 27 Oil & Gas Rep. 799; November 20, 1967
James W. R. Brown, 300 Continental Bldg., Omaha, Neb., for the petitioner. Ronald M. Rykberg, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioner's income tax for its fiscal year ended May 31, 1963, in the amount of $3,129.79. The issues for decision are: (1) Whether respondent properly disallowed a portion of the deduction for depletion claimed by petitioner because of computing its depletion on a percentage instead of a cost depletion basis. (2) Whether a deduction in the amount of $1,600 claimed by petitioner as leasehold amortization is properly allowable. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner was incorporated under the laws of the State of Nebraska in October 1959. Its principal office at the time the petition in this case was filed was and at all other times here pertinent has been at Kimball, Nebraska. Its Federal corporate income tax returns from the time of its incorporation have been filed on a cash basis of accounting, and its returns for the fiscal years ended May 31, 1960, May 31, 1961, May 31, 1962, and *31 May 31, 1963, were filed with the district director of internal revenue at Omaha, Nebraska. The articles of incorporation of petitioner were filed with the Secretary of State of Nebraska by its incorporators, Ray Gunderson and L. V. Halcomb, on October 12, 1959. These articles stated the nature of petitioner's business and the purpose for which the corporation was formed to be to engage in any activity in connection with the planting, harvesting, grading, handling, processing, storing, shipping, warehousing and marketing of wheat, grain or other products; to engage in any activity in connection with the purchasing, raising, feeding and selling of cattle, sheep, swine or other livestock; to engage in any activity in connection with the purchasing, acquiring, owning, holding, leasing, drilling, prospecting, developing, selling and disposing of oil, gas or other minerals; to acquire and hold property; to enter into and perform contracts or arrangements with any government, National, State, municipal, local or otherwise; and to do other necessary and proper acts in furtherance of the purpose for which it was formed. The charter recited that the authorized capital stock of the corporation *32 should consist of 1,000 shares of common stock with a par value of $100 per share to be fully paid when issued and that the minimum amount of capital with which the corporation should commence doing business should be $20,000. At all times from the issuance date, October 16, 1959, to August 15, 1960, petitioner had issued and outstanding 130 shares of common stock having a stated par value of $100 per share and no other capital stock of any kind. Of the 130 shares, L. V. Halcomb owned 60 shares and his wife, Dorothy, 5 shares; and Ray Gunderson owned 60 shares and his wife, Maxine, 5 shares. To its corporate income tax return filed for the fiscal year ended May 31, 1960, petitioner attached a statement "with reference to property transferred to the corporation under Sec. 351 of the 1954 I.R.C." This statement referred to two transfers; one on October 16, 1959, and the other on January 5, 1960. On October 16, 1959, Ray Gunderson and L. V. Halcomb each transferred 5,000 bushels of wheat to the corporation, the cost or other basis of such wheat in the hands of the transferors being zero. The issued and outstanding capital stock immediately prior to the exchange *33 was stated to be 110 shares of common stock and immediately after the exchange to be 130 shares of common stock. In the exchange 10 shares of common stock were issued to Ray Gunderson and 10 shares of such stock were issued to L. V. Halcomb. The fair market value of such stock was stated to be $100 per share. It was further stated that there were no securities outstanding immediately prior to the exchange, and immediately after the exchange the principal amount of securities outstanding was $15,000 in corporate debentures dated November 1, 1959, due November 1, 1969, with interest at 5 percent per annum payable annually, one debenture in the principal amount of $7,500 being issued to Ray Gunderson, and the other debenture in the principal amount of $7,500 being issued to L. V. Halcomb. These securities were stated to have a fair market value of $15,000. On January 5, 1960, Ray Gunderson and L. V. Halcomb transferred 5,000 bushels and 500 bushels of wheat, respectively, to petitioner, which wheat had a cost basis in the hands of the transferors of zero. In exchange for the wheat, securities in a total amount of $8,250 were issued by petitioner, consisting of a debenture dated January 5, 1960, due *34 January 5, 1971, in the principal amount of $7,500 with interest at 5 percent per annum payable annually issued to Ray Gunderson, and a debenture dated January 5, 1960, due January 5, 1971, in the principal amount of $750 with interest at 5 percent per annum payable annually issued to L. V. Halcomb. On August 15, 1960, an additional 105 shares of petitioner's common stock were issued to Ray Gunderson, and an additional 105 shares of such stock were issued to L. V. Halcomb. Petitioner attached a statement to its corporate income tax return for its fiscal year ended May 31, 1961, in which it stated that on August 15, 1960, Ray Gunderson and L. V. Halcomb transferred 9,500 and 7,500 bushels of wheat, respectively, to petitioner in a transaction to which Section 351, I.R.C. 1954 was applicable. The cost or other basis of the wheat to the transferors was stated to be zero. The transfer was stated to be in exchange for 105 shares of $100 par value common stock of petitioner to each of the transferors and a corporate debenture of petitioner in the principal amount of $2,800 dated August 15, 1960, due August 15, 1971, with interest at 5 percent annually issued to *35 Ray Gunderson. L. V. Halcomb died on July 21, 1961. He bequeathed the 165 shares of petitioner's stock owned by him to his wife, Dorothy. With this exception there has been no change in the ownership of petitioner's stock since August 15, 1960. Petitioner on its corporate income tax return filed for the fiscal year ended May 31, 1962, attached a statement "with reference to property transferred to the corporation under Sec. 351 of the 1954 Code." The statement referred to a transfer of July 5, 1961, whereby Ray Gunderson and L. V. Halcomb transferred 250 and 6,500 bushels of wheat, respectively, to petitioner, which wheat had a cost or other basis in the hands of the transferors of zero. According to this statement, the total issued and outstanding capital stock of the corporation immediately prior to the exchange was $34,000, of which amount Ray Gunderson owned $16,500 and L. V. Halcomb owned $16,500, and no stock of the corporation was issued in the exchange. In the exchange there was issued to Ray Gunderson a debenture in the principal amount of $350 dated August 1, 1961, due August 1, 1973, at 5 percent per annum, and there was issued to L. V. Halcomb a debenture in the principal *36 amount of $9,550 dated August 1, 1961, due August 1, 1973, at 5 percent per annum. [1]
Neither Ray Gunderson nor his wife, Maxine, has at any time been related by blood or marriage to L. V. Halcomb or his wife, Dorothy. From the date of its incorporation until May 7, 1960, petitioner's directors were L. V. Halcomb, Maxine Gunderson, and Dorothy Halcomb. At all times subsequent to May 7, 1960, the directors have been Ray Gunderson, Maxine Gunderson, and Dorothy Halcomb. From the date of its incorporation until May 7, 1960, petitioner's officers were L. V. Halcomb, president; Maxine Gunderson, vice president; and Dorothy Halcomb, secretary-treasurer. At all times subsequent to May 7, 1960, its officers have been Ray Gunderson, president; Maxine Gunderson, vice president; and Dorothy Halcomb, secretary-treasurer. Ray Gunderson is a farmer and has been engaged in that occupation for over 30 years. L. V. Halcomb was a lawyer who practiced law prior to the date of his death in Kimball, Nebraska. Halcomb *37 was associated in the practice of law with P. M. Everson, who prepared petitioner's Federal income tax returns for the fiscal years ended May 31, 1960, May 31, 1961, May 31, 1962, and May 31, 1963. In addition to practicing law, Halcomb owned and operated farmlands. On December 21, 1959, petitioner entered into an agreement with Tonyes Piening to purchase certain specifically described property for the sum of $41,600, with an agreed downpayment of $12,064, and the balance of $29,536 to be paid on March 1, 1960. On January 8, 1960, petitioner entered into an agreement with Paul H. and Luella M. Mockett, whereby petitioner agreed to pay to the Mocketts the sum of $22,400 and to convey to the Mocketts the property which petitioner had entered into an agreement to purchase from Tonyes Piening, and the Mocketts in return agreed to convey to petitioner certain specifically described land. By warranty deed dated January 25, 1960, Tonyes Piening conveyed the property which was the subject of the December 21, 1959, agreement to petitioner, and by warranty deed dated February 8, 1960, the Mocketts conveyed to petitioner the land described in their agreement with petitioner dated January 8, 1960. *38 By real estate mortgage dated February 29, 1960, petitioner mortgaged the Mockett land to Tonyes Piening to secure the sum of $29,536 payable to him by petitioner on March 1, 1960, and on April 7, 1960, petitioner paid to the Mocketts the sum of $22,400 and conveyed by warranty deed to the Mocketts the land conveyed to it from Tonyes Piening by warranty deed dated January 25, 1960. Under date of March 24, 1960, Ray Gunderson signed a document entitled, "Offer to Trade" which read as follows: TO: The Board of Directors of Kimball Farms, Inc., Kimball, Nebraska: I, the undersigned, hereby offer to convey to Kimball Farms, Inc., Kimball, Nebraska, the following described property, to-wit: 7/120 interest in and to the royalty share of the oil, gas and other minerals that may be produced from the Muddy Sand of the Lower Cretaceous Age, commonly designated as the Muddy "J" sand located below the Huntsman Shale formation and above the Skull Creek Shale formation in, on and under Section 15, Township 17 North, Range 53, Banner County, Nebraska, under, by authority of and during the continuance of the oil and gas lease dated December 22, 1949, recorded in Book 1, Pages 398 and 399 *39 Oil and Gas Records of Banner County, Nebraska, in exchange for Kimball Farms, Inc., of Kimball, Nebraska, conveying to me the following described real estate, to-wit: All of Section 18, Township 12 North, Range 56, West of the Sixth Principal Meridian, Kimball County, Nebraksa, except the oil, gas and other minerals. Under date of March 24, 1960, L. V. Halcomb executed a document entitled, "Offer to Trade" which was identical to the document executed by Ray Gunderson except for the description of the property to be conveyed by petitioner to him. The oil interests referred to in each of these documents were known as, and will hereinafter be referred to, as the Johnson "O" lease. The land to be conveyed by petitioner to Ray Gunderson and the land to be conveyed by petitioner to L. V. Halcomb was one section each of the land which had been conveyed by the Mocketts to petitioner by warranty deed dated February 8, 1960. The total amount of land conveyed by the Mocketts to petitioner was two sections or 1,280 acres and the total purchase price which petitioner paid for the land was $64,000. Ray and Maxine Gunderson executed and delivered to petitioner a deed dated April 1, 1960, conveying *40 to petitioner the 7/120ths royalty interest in the Johnson "O" lease referred to in the document dated March 24, 1960, and this deed was filed for record in Banner County, Nebraska on May 13, 1960. L. V. and Dorothy Halcomb executed and delivered to petitioner a deed dated April 1, 1960, conveying to petitioner 7/120ths royalty interest in the Johnson "O" lease referred to in the document executed by them under date of March 24, 1960, and this deed was filed for record in Banner County, Nebraska, on May 13, 1960. Each of these deeds recited that it was for and in consideration of the "conveyance of other interests in real property." Petitioner, by its president, executed a deed dated April 1, 1960, conveying to Ray Gunderson one section of the land deeded to petitioner by the Mocketts on February 8, 1960, and similarly petitioner, by its president, executed a deed conveying to L. V. Halcomb one section of the land conveyed to petitioner by the Mocketts by deed dated February 8, 1960. The documents were delivered to Ray Gunderson and L. V. Halcomb. Each of these deeds was filed for record in Kimball County, Nebraska on May 18, 1960. Each of these deeds stated in part that it was *41 given in consideration of "conveyance of other interests in real property." On August 12, 1960, petitioner entered into an agreement to purchase from Maude and J. R. Paterson, for the sum of $105,000 certain property located in Kimball County, Nebraska, which property will hereinafter be referred to as the Paterson land. Under this agreement petitioner agreed to pay $5,000 immediately, $20,000 on or before September 10, 1960, and the balance in five equal annual installments. The Patersons agreed upon receipt of all payments to convey the property to petitioner by warranty deed. The agreement contained a forfeiture provision in the event of petitioner's failure to make payment and further provided that Gordon French, an agricultural tenant as to Section 11 of the land, had the privilege of remaining in possession and continuing as an agricultural tenant for 3 years. The Paterson land which was the subject of the agreement of August 12, 1960, between petitioner and the Patersons consisted of a half section of land separated by about 8 1/2 miles from another portion of land which was a full section. The Paterson land was located between 20 and 25 miles from the land petitioner had *42 purchased from the Mocketts. Petitioner, by its president, and Ray Gunderson and L. V. Halcomb, individually, on September 30, 1960, executed a document entitled, "Agreement", which read in part as follows: Agreement made and entered into this 12th day of September, 1960, by and between Kimball Farms, Inc., Kimball, Nebraska, a corporation, hereinafter referred to as Seller, and L. V. Halcomb and Ray Gunderson, Kimball County, Nebraska, hereinafter referred to as Buyers, WITNESSETH: WHEREAS, the Seller on August 12, 1960, entered into an agreement to purchase the following described real estate, to-wit: The East Half and the East Half of the West Half of Section 11, Township 16 North, Range 54 West of the 6th P.M., Kimball County, Nebraska, together with an undivided one-half of the oil, gas and other minerals in, on and under said real estate, from Maude Paterson and J. R. Paterson, (hereinafter referred to as Paterson Agreement); and WHEREAS, on September 10, 1960, Buyers submitted to Board of Directors of Seller an offer to convey the following described real estate, to-wit: 10/120ths (5/120ths each) interest in and to the royalty share of the * * * [Johnson "O" *43 lease] in exchange for the Seller conveying or causing to be conveyed to Buyers the following described real estate, to-wit: The East Half and the East Half of the West Half of Section 11, Township 16 North, Range 54 West of the 6th P.M., Kimball County, Nebraska; and WHEREAS, the Board of Directors of the Seller on September 10, 1960, at a meeting of said Board duly called, did pass and adopt a resolution approving the proposed exchange of real estate and directing that an agreement be entered into with Buyers setting forth the terms of said exchange. NOW THEREFORE, in consideration of the Buyers having this date conveyed to Seller the royalty interest above described and pursuant to the resolution adopted by the Board of Directors of the Seller, the parties hereto agree as follows: 1. The Seller acknowledges that Buyers have duly executed and delivered a deed conveying to it the royalty interest which the Seller is to receive in the exchange. 2. The Seller agrees to convey to Buyers as tenants in common the following described real estate, to-wit: The East Half and the East Half of the West Half of Section 11, Township 16 North, Range 54 West of the 6th P.M., Kimball *44 County, Nebraska. which Seller has contracted to purchase under the Paterson Agreement, conveyance to be made by warranty deed so soon as Seller has received deed to said real estate as provided in said Paterson Agreement. 3. The Seller agrees to pay the balance of the purchase price, together with interest, agreed to be paid by it under the Paterson Agreement, and shall forever indemnify and hold harmless the Buyers from any obligation on their part to pay any part of said purchase price and interest. In the event Seller fails to pay the balance of the purchase price and interest, or any part thereof, under the Paterson Agreement, Buyers may pay the same and shall have a claim and lien against any and all assets of Seller for the amount so paid. 4. The Seller shall be entitled to retain possession of said real estate herein agreed to be conveyed to Buyers, and receive all income therefrom until the wheat planted in the fall of 1962 shall be harvested in 1963 except that Buyers may go upon said real estate in 1963 and summer fallow and plant wheat in the fall of 1963. On September 30, 1960, Ray and Maxine Gunderson executed and delivered to petitioner a deed conveying to petitioner *45 a 5/120ths interest in the Johnson "O" lease, which deed recited that it was for and in consideration of the "conveyance of other interests in real property." This deed was filed for record in Banner County, Nebraska on October 7, 1960. On September 30, 1960, L. V. and Dorothy Halcomb executed and delivered to petitioner a deed conveying a 5/120ths interest in the Johnson "O" lease which deed similarly recited that it was for and in consideration of the "conveyance of other interests in real property." This deed was likewise filed for record in Banner County, Nebraska on October 7, 1960. On November 1, 1960, petitioner by its president, and L. V. Halcomb and Ray Gunderson, individually, executed a document entitled, "Agreement," which was similar to the agreement executed between petitioner and Ray Gunderson and L. V. Halcomb under date of September 30, 1960, except that the land to be conveyed to the buyers as tenants in common was described as "The West Half of Section 1, Township 16 North, Range 56 West of the 6th P.M., Kimball County, Nebraska, together with an undivided one-half of the oil, gas and other minerals in, on and under said real estate," which property was also *46 a portion of the Paterson land, and the property to be conveyed by L. V. Halcomb and Ray Gunderson to petitioner with a one-half (one-fourth each) interest in and to the royalty share of the oil, gas and other minerals on certain property referred to therein as the Gunderson lease. By deeds dated November 1, 1960, Ray and Maxine Gunderson and L. V. and Dorothy Halcomb each conveyed to petitioner a one-fourth interest in the royalty share of the Gunderson lease. These deeds were filed for record in Kimball County, Nebraska on December 16, 1960. The British-American Oil Producing Company was the operator under the Johnson "O" lease. The Gundersons had by a mineral deed conveyed a one-half interest in and to the royalty share from such lease to J. V. Halcomb on April 23, 1957. The Gunderson lease had been given by the Gunderson and the Halcombs to the Pan American Petroleum Corporation on March 28, 1957. Prior to October 1959, Ray and Maxine Gunderson and L. V. and Dorothy Halcomb had recovered their cost basis in their interests in and to the oil, gas, and other minerals to be produced by the Johnson "O" lease through prior depletion deductions and were, therefore, only entitled *47 to claim percentage depletion allowances with respect thereto for Federal income tax purposes. Prior to October 1959, Ray and Maxine Gunderson and L. V. and Dorothy Halcomb had recovered their cost basis in their entire interests in and to the oil, gas and other minerals to be produced from the Gunderson lease through prior depletion deductions and were, therefore, only entitled to claim percentage depletion allowances with respect thereto for Federal income tax purposes. In January and February 1961 various documents were executed by the Gundersons and petitioner whereby the Gundersons conveyed 280 acres of the Mockett land to petitioner until October 1, 1963. Various documents were executed in January and February 1961 by petitioner and the Halcombs whereby the Halcombs conveyed a total of 280 acres of the Mockett land to petitioner until October 1, 1963. Under the agreements, L. V. Halcomb and Ray Gunderson were each to receive a debenture of petitioner in the amount of $1,600 to become due in 10 years and to draw interest at 5 percent per annum. The 560 acres involved in these transactions were so located that petitioner was able to obtain more advantageous wheat allotments *48 because of being the record owner of this land. A farm lease was executed on February 8, 1961, by petitioner and Gordon French under which all of the Paterson land and the portion of the Mockett land which had been the subject of the various documents dated in January and February 1961 between petitioner and the Gundersons and the Halcombs were leased to French by petitioner for the period March 1, 1961 to March 1, 1964. Petitioner was to receive as rent under the lease two-fifths of the crops harvested and delivered to market. On August 26, 1963, petitioner, by its president, and the Gundersons and Dorothy Halcomb executed an agreement whereby Ray Gunderson and Dorothy Halcomb would convey the east one-half and the east one-half of the west one-half of section 11 and the west one-half of section 1 of the Paterson land, or a total of 800 acres to petitioner for the period from October 1, 1963, to October 1, 1965, and in return Ray Gunderson and Dorothy Halcomb were each to receive a $1,600 corporate debenture from petitioner. This land was the land Gunderson and Halcomb were to obtain possession of in the fall of 1963 under the agreement of September 12, 1960, executed on September 30, 1960. *49 During November and December 1963 petitioner and the Patersons granted two separate easements for cable lines and appurtenances over portions of the Paterson land to the United States. On November 12, 1963, the Patersons and petitioner, as lessors, and T. N. Jordon, Jr., as lessee, executed an oil and gas lease involving a portion of section 11 of the Paterson land. On September 27, 1965, the Patersons conveyed the Paterson land by warranty deed to petitioner. The deed recited that the Patersons had received the $105,000 purchase price specified in the agreement. On the same date petitioner by warranty deed conveyed to Ray Gunderson and Dorothy Halcomb the portion of the Paterson land referred to in the agreement executed on September 30, 1960, and on this same date the Gundersons conveyed the west one-half of section 1 of the Paterson land and other specifically described real estate by warranty deed to Dorothy Halcomb, and Dorothy Halcomb by warranty deed conveyed section 11 of the Paterson land to Ray Gunderson. Since its incorporation petitioner's income has consisted principally of its share of the oil royalty proceeds from the Johnson "O" and Gunderson leases and receipts *50 from sales of grain, much of which grain was grown and harvested on the Paterson and Mockett lands. Petitioner, on its Federal corporate income tax returns for its fiscal years ended May 31, 1960 through May 31, 1963, reported the following amounts of income and showed income tax due in each year as indicated below: Fiscal year
Taxable
Income
ended May 31
income
tax due
1960
$24,409.38
$7,322.81
1961
25,020.42
7,510.62
1962
16,098.20
4,829.46
1963
3,498.50 *
690.87 *
The assets and liabilities as shown on the balance sheets attached to petitioner's Federal income tax returns for its fiscal years ended May 31, 1960, 1961, 1962, and 1963, showed the following assets and liabilities as of the end of each of these years: Fiscal year ended
Fiscal year ended
May 31, 1960
May 31, 1961
Assets
Amount
Total
Amount
Total
Cash
$993.08
$21,030.20
Invent. other
than last-in,
first-out
$420.34
Invent. last-
in, first-
out
420.34
Bldgs. &
other fixed
deprec.
assets
10,000.00
Less: Accum.
amort. &
deprec.
266.25
9,733.75
Depl.
assets
$64,000.00
144,250.00
Less: Accum.
depl.
64,000.00
27,493.60
116,756.40
Land
17,950.00
Intang. assets
(amort.
only)
52.30
52.30
Less: Accum.
amort.
52.30
52.30
Total
assets
$65,045.38
$165,942.99
Liabilities
Accts. payable
Mtgs., notes &
bonds payable
in less than
1 year
Loans from
stock-
holders
$23,250.00
$29,250.00
Bonds, notes,
mtgs. payable
in 1 year
or more.
29,536.00
109,536.00
Capital
stock
com-
mon
$13,000.00
13,000.00
$34,000.00
34,000.00
Earned sur-
plus & undiv.
profits
740.62
(6,843.01) *
Total lia-
bilities
$65,045.38
$165,942.99
*51 Fiscal year ended
Fiscal year ended
May 31, 1962
May 31, 1963
Assets
Amount
Total
Amount
Total
Cash
$30,614.34
$11,419.94
Invent. other
than last-in,
first-out
Invent. last-
in, first-
out
420.34
420.34
Bldgs. &
other fixed
deprec.
assets
$17,985.86
$23,450.87
Less: Accum.
amort. &
deprec.
2,725.50
15,260.36
5,571.13
17,879.74
Depl.
assets
144,250.00
144,250.00
Less: Accum.
depl.
43,300.47
100,949.53
55,588.23
88,661.77
Land
14,750.00
14,750.00
Intang. assets
(amort.
only)
Less: Accum.
amort.
Total
assets
$161,994.57
$133,131.79
Liabilities
Accts. payable
Mtgs., notes &
bonds payable
in less than
1 year
$12,000.00
$ 468.18
Loans from
stock-
holders
39,150.00
39,150.00
Bonds, notes,
mtgs. payable
in 1 year
or more.
85,000.00
69,000.00
Capital
stock
com-
mon
$34,000.00
34,000.00
$34,000.00
34,000.00
Earned sur-
plus & undiv.
profits
(8,155.43) *
(9,486.39) *
Total lia-
bilities
$161,994.57
$133,131.79
*52 For 8 or 9 years prior to the formation of petition, Ray Gunderson and L. V. Halcomb had been associated in the purchase of land and mineral interests. Generally, each would own a half interest in the properties they purchased jointly but in a number of instances the property, at the suggestion of L. V. Halcomb, would be placed in the name of Ray Gunderson only. About 3 years prior to 1959 Ray Gunderson became concerned that in the event of his death some difficulty might arise with respect to properties owned jointly by him and L. V. Halcomb. He, at that time, suggested to Halcomb that they form a corporation to hold title to the properties they owned jointly. Prior to the time petitioner was formed in 1959 all properties owned jointly by Ray Gunderson and L. V. Halcomb had been transferred from Gunderson's name only into the joint names of Gunderson and Halcomb or the properties had been divided and one-half transferred into the name of each Gunderson and Halcomb. In 1959 when petitioner was formed, it was at L. V. Halcomb's suggestion that the royalty interest shares in oil owned by Ray Gunderson and L. V. Halcomb individually were transferred to petitioner. Prior to the transfer *53 the tax effects of the transaction were discussed by Gunderson and Halcomb. Gunderson accepted Halcomb's judgment with respect to the transfers to be made to petitioner. Petitioner was furnished with a letter dated September 6, 1960, from Robert L. Poundstone, Consulting Petroleum Geologist and Engineer, pertaining to the Johnson "O" lease, which stated in part as follows: * * * The remaining estimated recoverable reserves as of August 1, 1960 for 100% interest (including royalty interest) is approximately 675,000 gross barrels. Petitioner received no other formal report or estimate of recoverable oil reserves with respect to the Johnson "O" or Gunderson leases. Production from the Johnson "O" lease for the months of April, May, June, July, August, and September 1960, as contained in the records on file in the office of the Nebraska Oil and Gas Conservation Commission, indicate 30,644, 34,771, 33,184, 32,166, 37,715, and 36,265 barrels, respectively. An estimate made by a recognized geologist of the prospective production of the Johnson "O" lease as of April 1, 1960, showed that a 14/120ths interest in a one-eighth royalty share of product could be credited with 8,166 barrels *54 of primary oil and 9,546 barrels of secondary oil, or total recovery of 17,712 barrels. The geologist who made this estimate knew that the reserves of the Johnson "O" lease as of August 1, 1960, were in excess of the amount which he estimated but because of the hazards connected with the field and his inability to evaluate the additional reserves, adjusted his discount factor instead of attempting to evaluate the additional reserves. Actual production of the 14/120ths interest in the Johnson "O" lease from April 1, 1960, through March 1967 was 23,335 barrels and the lease is still producing. A geological estimate of a 10/120ths interest in a one-eighth royalty interest in the Johnson "O" lease as of September 1960 showed an expectation of 6,732 barrels of primary oil and 8,639 barrels of secondary oil, or a total of 15,371 barrels. As of March 1967 actual production from the 10/120ths interest in the Johnson "O" lease from September 1960 had totaled 14,539.87 barrels and production was still being obtained. Based on a production of 8,166 barrels of primary oil and 9,546 barrels of secondary oil, the fair market value of a 14/120ths interest in the royalty share of production from *55 the Johnson "O" lease as of April 1, 1960, would be $40,987. Based on a production of 6,732 barrels of primary oil and 8,639 barrels of secondary oil, the fair market value of a 10/120ths interest in the royalty share of production from the Johnson "O" lease as of September 30, 1960, would be $34,399. For the months from November 1960 through May 31, 1961, the total production from the Gunderson lease was 5,627.42, 6,156.03, 6,382.88, 5,543.28, 4,987.89, 2,236.98, and 1,752.43, respectively, or a total of 32,686.91, and a one-half share in the royalty interest of this production for that period was a total of 2,042.93 barrels. For the fiscal years ended May 31, 1962, 1963, 1964, 1965, and 1966, respectively, total production from the Gunderson lease was 9,244.47, 5,766.10, 4,101.29, 3,129.46, and 1,151.94, respectively, and a one-half share in the royalty interest for these respective years was 577.78, 360.38, 256.33, 195.56, and 72.00 barrels, respectively. For the months of June 1966 through February of 1967, production from the Gunderson lease was averaging approximately 65 barrels a month. The cause of the decline in production from the Gunderson lease after approximately March *56 1961 was the fact that wells on the upstructure were withdrawing both oil and water from the reservoir at a rate which pulled oil from under the Gunderson lease and increased the water encroachment, causing a decline in the oil production. Based on expected recoverables of 3,160 barrels of primary oil and 2,452 barrels of secondary oil, which was estimated to be the expected recoverables of a one-half share in a royalty interest of the production of the Gunderson lease as of November 1, 1960, the fair market value of a one-half royalty share of production as of that date would be $10,325. Petitioner on its Federal income tax return for the fiscal year ended May 31, 1963, claimed a deduction for cost depletion in the total amount of $12,287.76, allocated to the 14/120ths interest in the Johnson "O" lease, the 10/120ths interest in the Johnson "O" lease, and the one-half royalty interest in the Gunderson lease in the amounts of $6,431.60, $4,965.42, and $890.74, respectively. This amount of depletion was claimed with respect to the total receipts of $13,015.78 reported by petitioner on its tax return for the fiscal year ended May 31, 1963, as the total proceeds received from a 14/120ths *57 producing royalty interest in the Johnson "O" lease, a 10/120ths producing royalty interest in the Johnson "O" lease, and a one-half producing royalty interest in the Gunderson lease. Respondent in his notice of deficiency disallowed $8,708.41 of the depletion deduction claimed by petitioner with the following explanation: It is determined that depletion based on cost is unallowable therefore depletion is being allowed on a percentage basis computed as shown below. It is determined that the deduction for depletion is $3,579.35 in lieu of $12,287.76 reported on your income tax return. Accordingly, your taxable income is increased $8,708.41. Depletion per return
$12,287.76
Percentage depletion 27.5% X
$13,015.78
3,579.35
Adjustment
$ 8,708.41
Petitioner on its income tax return for its fiscal year ended May 31, 1963, claimed under depreciation a deduction in the amount of $1,600 which was stated to be with respect to a leasehold with a cost or other basis at the beginning of the year of $3,200, acquired in 1961, with a depreciation rate of 50 percent on a straight-line method. Respondent in his notice of deficiency disallowed the claimed deduction with *58 a notation, "Cost of land not a leasehold." Opinion It is petitioner's position that Ray Gunderson and L. V. Halcomb made an exchange of properties with petitioner exchanging the oil interests in the Johnson "O" and Gunderson leases for farmland. Petitioner states that the exchanges were made pursuant to written offers of Ray Gunderson and L. V. Halcomb and that the deeds transferring the various properties stated that the consideration for the transfers were the conveyances of other interests in real property. Respondent does not deny that the forms of the transactions entered into between Ray Gunderson and L. V. Halcomb and petitioners were exchanges of property. His contention is that in substance the transactions constituted a contribution by Ray Gunderson and L. V. Halcomb, who with their respective wives were the sole stockholders of petitioner, of the fractional oil royalty interests to petitioner's capital. Respondent cites a number of cases holding that in determining, for Federal tax purposes, the effect of transfers of property, courts will look beyond the form to the substance of the transaction. One of the cases cited by respondent for this proposition is the recent *59 case of D. J. Campbell Co. v. United States, 370 F. 2d 336 (Ct. Cls., 1966). This case involved a question of whether the taxpayer was entitled to amortize an amount paid to a former stockholder for a contract which the taxpayer had previously transferred to the stockholder as partial consideration for surrender of his stock. The Court concluded that even though the transfer to the taxpayer involved in that case was not a sham transaction, nevertheless, in substance the payment made by that taxpayer to its former stockholder was in satisfaction of an obligation it had incurred to pay the stockholder in cash for his stock under a deferred payments plan. The Court in that case referred to the established principle that courts looked beyond the form of the transaction to its substance, stating that the cases recognizing this established principle are limited by their own particular facts, and in a footnote at page 344 cited numerous cases involving questions of whether the form of a transaction reflects its substance for the purpose of determining the tax effect of the transaction. We agree with respondent that in the instant case the substance of the transaction here *60 involved was a contribution by Ray Gunderson and L. V. Halcomb of their fractional share in oil royalties to petitioner's capital. The detailed facts which we have set forth show that at approximately the time petitioner was incorporated 130 shares of its stock were issued, 60 shares each to Ray Gunderson and L. V. Halcomb and 5 shares each to their respective wives. Since the balance sheet of the corporation shows the value of capital stock at May 31, 1960, as $13,000, apparently either money or some other property of a value of $11,000 was paid in by Ray Gunderson and L. V. Halcomb and their wives for 110 shares of this stock. The record shows that on October 16, 1959, Ray Gunderson and L. V. Halcomb each transferred 5,000 bushels of wheat to petitioner for which they each received 10 shares of petitioner's stock of a fair market value of $100 per share and each received a 10-year debenture bond of $7,500 bearing interest at 5 percent. Insofar as the record shows, petitioner received no other funds or property until January 5, 1960, when Ray Gunderson transferred 5,000 bushels of wheat to petitioner and received a 10-year debenture bond of $7,500 bearing interest at 5 percent and *61 L. V. Halcomb transferred 500 bushels of wheat to petitioner and received a 10-year debenture bond of $750 at 5 percent, thus bringing the outstanding debentures of petitioner to $23,250 and its capital stock to $13,000. On December 21, 1959, having the funds of $28,000 which it had received from Ray Gunderson and L. V. Halcomb for stock and debentures, petitioner entered into an agreement to purchase certain property which required a downpayment of $12,064 and required that the balance of $29,536 be paid by March 1, 1960. As of January 5, 1960, when the next transfer of property for debentures was made by Ray Gunderson and L. V. Halcomb to petitioner, petitioner apparently had approximately $16,000 of the amount previously paid to it by Ray Gunderson and L. V. Halcomb still available, and after the transfer of January 5, 1960, had slightly over $24,000 available. Three days later on January 8, 1960, petitioner entered into an agreement to buy the Mockett land for the sum of $22,400 cash and conveyance to the Mocketts of the land it had contracted to buy on December 21, 1959. Thus, as of January 8, 1960, petitioner had committed substantially all of the available funds which had *62 been transferred to it by Ray Gunderson and L. V. Halcomb in exchange for stock and debentures and had acquired the Mockett land with an outstanding amount of $29,536 to be paid. On April 7, 1960, petitioner paid the $22,400 to the Mocketts and received a warranty deed to the Mockett land which it mortgaged to secure the indebtedness of $29,536 still due on the land it had purchased under the contract of December 21, 1959. The documents entitled, "Offer to Trade," one executed by Ray Gunderson and the other executed by L. V. Halcomb, each dated March 24, 1960, in form, offered to trade 7/120ths each (14/120ths total) royalty interest in the Johnson "O" lease to petitioner for petitioner's conveying one-half of the Mockett land to each of them. By deeds formally executed under date of April 1, 1960, and recorded in May 1960, the conveyances were made of the various properties in accordance with the offers to trade and these deeds duly recited that the consideration in each instance was conveyance of other interests in real property. It is apparent from this set of facts that what actually transpired was that Ray Gunderson and L. V. Halcomb turned over to petitioner prior to March 24, 1960, when *63 the documents entitled, "Offer to Trade" were signed, cash and grain with a total value of $36,250 in exchange for 130 shares of petitioner's $100 par value stock (5 shares issued to their respective wives) and 10-year debenture bonds bearing interest at 5 percent totaling $23,250, thereby furnishing petitioner with funds of approximately $36,250 from which petitioner expended $34,464 for land which was transferred to Ray Gunderson and L. V. Halcomb, the land being mortgaged to secure the balance due on it. On August 12, 1960, petitioner entered into a contract to purchase the Paterson land for $105,000 and on August 15, 1960, Ray Gunderson and L. V. Halcomb transferred to petitioner 9,500 and 7,500 bushels of wheat, respectively. In return for the exchange Ray Gunderson and L. V. Halcomb each received 105 shares of petitioner's common stock of a value of $100 per share and in addition Ray Gunderson received a 10-year debenture bond in the amount of $2,800 bearing 5 percent interest. This transaction apparently furnished petitioner with funds in the amount of approximately $23,800. Under the agreement of August 12, 1960, to purchase the Paterson land, petitioner was to pay $5,000 *64 immediately, $20,000 on or before September 10, 1960, and the balance in five annual installments. Therefore, the funds furnished to petitioner by Ray Gunderson and L. V. Holcomb on August 15, 1960, were substantially the amount needed by petitioner to purchase the Paterson land. On September 30, 1960, petitioner in form entered into a written contract with Ray Gunderson and L. V. Halcomb agreeing to convey to each of them a portion of the Paterson land in return for each of them conveying a 5/120ths (10/120ths total) interest in a royalty share of the Johnson "O" lease On November 1, 1960, petitioner, in form, entered into an agreement with Ray Gunderson and L. V. Halcomb to convey to each of them an additional portion of the Paterson land in return for each of them conveying to petitioner a one-fourth (one-half total) interest in the royalty share of the oil and gas to be produced from the Gunderson lease. When the facts are set forth in the sequence in which the various transactions occurred, it is readily apparent that Ray Gunderson and L. V. Halcomb supplied to petitioner the funds with which petitioner purchased land to convey to them, individually, in a purported exchange *65 for oil and gas interests. The real effect of this roundabout transaction is not substantially different than if Ray Gunderson and L. V. Halcomb had conveyed the oil and gas interests in the Johnson "O" and Gunderson leases to petitioner in return for stock and debentures and used their own funds in part received from the sale of the wheat to buy the Mockett and Paterson lands. To the extent that any difference exists, it appears to be a tax benefit to Gunderson and Halcomb. By transferring wheat with a zero basis to petitioner, which wheat petitioner apparently sold to obtain the funds needed for the purchase of the various lands, a tax advantage may have resulted to Gunderson and Halcomb, by having the land purchased with funds which had not been subject to income tax, to the same extent as if Gunderson and Halcomb had personally sold the wheat and purchased the land with the proceeds. Whether or not the sale of the wheat by petitioner was a tax advantage to Gunderson and Halcomb, it is unmistakably clear that having the transfer of the oil interest to petitioner be in return for property of substantial value instead of being a direct contribution to petitioner's capital would have *66 resulted in a decided tax savings if it had not been questioned. Prior to October 1959 Ray Gunderson and L. V. Halcomb had each recovered his entire cost basis in the oil interests which were transferred to petitioner and was entitled only to claim percentage depletion. A bona fide sale of these oil interests to petitioner would give petitioner a cost basis on which to claim depletion. The transactions here are complicated not only by the various transfers which we have discussed but also by the agreements between Ray Gunderson and L. V. Halcomb and petitioner with respect to petitioner's use of land. In effect, however, the funds which petitioner used to purchase the land came from loans or contributions to its capital by Ray Gunderson and L. V. Halcomb. As of the end of its fiscal year 1963 petitioner had received $34,000 from Ray Gunderson and L. V. Halcomb for stock and $35,950 from Gunderson and Halcomb for which it issued debentures. [2] Petitioner had mortgages outstanding of $69,000 and retained a quarter section of the Paterson land which it valued at $14,750. (On a pro rata basis the value of this land would have been approximately $17,500.) The facts therefore show that *67 all the amounts paid for the lands transferred or to be transferred to Ray Gunderson and L. V. Holcomb, except approximately $13,000 to $16,000 had, as of May 31, 1963, come directly from them. The remainder appears to have come primarily from Gunderson and Halcomb via permitting petitioner to retain use of the Paterson land, originally until 1963, and later until 1965 when the Paterson land was paid for. At least Gunderson testified to the effect that the receipts from the sale of the wheat grown on this land to a large extent supplied the money for the mortgage payments. To have this land used by petitioner to pay off mortgages so that Gunderson and Halcomb would receive it clear of debt may, itself, have been a tax advantage to Gunderson and Halcomb depending on their tax brackets as compared to petitioner's. In any event, the burden of showing error in respondent's determination is on petitioner, and petitioner has shown no business purpose or substantive reason for having petitioner purchase land to transfer to Gunderson and Halcomb. Even the reason stated by Gunderson for petitioner's formation did not in fact exist at the time petitioner was formed. All that petitioner has shown *68 are the various papers and documents drawn to place the transactions in the form of exchanges by Gunderson and Halcomb of money and wheat with a zero basis for stock and securities of petitioner and an exchange of fractional oil royalty interests for the land purportedly purchased by petitioner with those funds. If the form of the transactions were controlling, these documents would support petitioner's position. However, petitioner must show that there was substance to the transactions in order to show error in respondent's determination. Stripped to their bare essentials, the transactions here are comparable to those in cases such as Burr Oaks Corp., 43 T.C. 635 (1965), affd. 365 F. 2d 24 (C.A. 7, 1966) certiorari denied 385 U.S. 1007; and Truck Terminals, Inc., 33 T.C. 876 (1960), affd. 314 F. 2d 449 (C.A. 9, 1963), which involved transactions in form a sale by a taxpayer of property to a wholly owned corporation in return for notes. In each of those cases we held that the transfer was in effect a nontaxable exchange *69 for an equity interest in the corporation. In Truck Terminals, Inc., supra, we pointed out that whether a transfer of property by a stockholder to a corporation constitutes, for Federal income tax purposes, a sale or a contribution to capital is a question of fact dependent upon the intent of the parties which is to be ascertained from all relevant facts and circumstances. We further pointed out that no rule of thumb or single criterion determines the result but that each case must be adjudicated upon its own facts. In Burr Oaks Corp., supra, we listed among some of the factors to be considered the amount and method of capitalization of the corporation, the relative importance of the assets transferred to other corporate assets, and the anticipated source of payment for the property transferred. Here, without in detail determining the value of the oil interests transferred to *70 petitioner by Ray Gunderson and L. V. Halcomb, from the evidence we conclude that the total value of those interests was approximately two-thirds of the value of the land in form transferred to Gunderson and Halcomb in exchange therefor. This divergence in value of the properties purportedly exchanged further supports the conclusion that in substance no exchange occurred. None of the cases to which our attention has been directed has facts identical to those in the instant case nor would it be expected that such would be the situation. As we pointed out in Gooding Amusement Co., 23 T.C. 408 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956), certiorari denied 352 U.S. 1031 (1957), there is a long series of cases involving situations where stockholders of a closely held corporation have entered into transactions at times for the purpose of obtaining a tax advantage for the corporation and at other times a tax advantage for the stockholders. As we stated in Gooding Amusement Co., supra, "There is nothing reprehensible in casting one's transactions *71 in such a fashion as to produce the least tax" but in so doing the substance of the transaction and not its form must control. In determining the substance a court is not bound by the instruments whereby the transaction is carried out, for generally speaking the instruments will be in the required legal form to sustain the type of transaction the particular taxpayer has in form planned. It is necessary to look at all the surrounding circumstances to determine the real substance of the transaction. Considering the various criteria and looking at the surrounding circumstances in the instant case we conclude that in substance Ray Gunderson and L. V. Halcomb made a contribution of the oil interests in the Johnson "O" and Gunderson leases to petitioner's capital. Petitioner argues that what respondent is in effect asking is that the corporate entity of petitioner be overlooked and contends that because of the real property transactions of petitioner in the instant case such an ignoring of the corporate entity is unjustified, citing in support of its contention, John F. Nutt, 39 T.C. 231 (1962), remanded on another issue 351 F. 2d 452 (C.A. 9, 1965), and certain *72 other cases of similar import. However, it is clear here that respondent is not attempting to ignore petitioner's corporate entity but is merely requiring that depletion be computed on the basis of the oil interests transferred being a contribution to petitioner's capital. This is in fact a recognition of the separate corporate entity of petitioner as is generally the situation where the question arises as to whether a transfer of property by stockholders to a corporation was a contribution to capital or a sale or exchange of property. We sustain respondent's position that petitioner is entitled to a deduction for depletion only on a percentage basis. Respondent in the alternative contends that his determination disallowing cost depletion to petitioner and substituting percentage depletion should be sustained under section 269, I.R.C. 1954, since petitioner was formed by Ray Gunderson and L. V. Halcomb for the principal purpose of evasion or avoidance of Federal income tax by securing the benefit of a cost depletion deduction in lieu of a percentage depletion deduction. The allegation that section 269 is applicable to this case was made affirmatively by respondent *73 in an amended answer filed at the trial. Petitioner argues that the burden of proof with respect to this issue is on respondent and also argues that a change from cost to percentage depletion is not within the scope of section 269 since respondent is not contending that no deduction for depletion is allowable and has not in fact disallowed the whole deduction. Since we have held for respondent on his major contention, it is unnecessary for us to decide the issue of the applicability of section 269. However, the evidence in this case is sufficient to show, irrespective of where the burden of proof lies, that the principal purpose of petitioner's formation was to enable Ray Gunderson and L. V. Halcomb to transfer to it oil interests so as to permit petitioner to obtain cost depletion deductions on properties on which Ray Gunderson and L. V. Halcomb personally would have been able to take only a percentage depletion deduction. The final issue here concerns whether petitioner is entitled to a deduction of $1,600 for amortization of a lease agreement. Respondent apparently originally disallowed the claimed deduction on the basis that the claimed deduction represented cost of land *74 and not of a 2-year leasehold interest. However, in his brief he argues that the transaction was a sham. From the facts we have found it appears that this land was transferred by Ray Gunderson and L. V. Halcomb to petitioner for 2 years in order that petitioner could obtain better wheat allotments on other land which, insofar as the record shows, was the Paterson land, the use of which Gunderson and Halcomb had left with petitioner until the mortgages on the land were paid off so that the income from the land could be used to pay the mortgage notes. Also, Gunderson and Halcomb received long-term debenture bonds for the transfer of the land to petitioner for 2 years indicating that this transaction to some extent resembled the prior transfers of wheat to petitioner for debentures. We agree with petitioner that in substance Gunderson and Halcomb were the owners of the Mockett and Paterson lands. The sham here was the purported acquisition of these lands by petitioner and the exchange of these lands to Gunderson and Halcomb for oil royalty interests. The substance of the transactions was that Gunderson and Halcomb purchased the lands themselves. However, part of the sham in the purchase *75 of the lands was the lands being used by petitioner to pay off the mortgage balances. While more doubt exists as to the substance of the transfer by Gunderson and Halcomb to petitioner of the 560 acres for a 2-year period than as to other aspects of the transactions, we conclude that petitioner has failed to sustain its burden of showing its right to deduct the $1,600 in its fiscal year 1963. Decision will be entered for respondent. Footnotes
1. This return also referred to two debentures of $1,600 each, one issued to Ray Gunderson and one to L. V. Halcomb to which reference will be made later in these findings.↩
*. The taxable income and income tax due shown in the above table for the fiscal year ended May 31, 1963 was as reported. The reported tax prior to reduction for an investment credit of $358.68 was $1,049.55.↩
*. On petitioner's corporate income tax return for its fiscal year ended May 31, 1961, under the designation "adjustments for tax purposes not recorded on books (attached schedule)" appears the notation "Wheat Capital $23,791.00" and on its corporate income tax return for its fiscal year ended May 30, 1962, under the same designation appears the notation, "Sec. 531 transaction $9,900.00."↩
2. The $3,200 balance of stockholder loans apparently represented the debentures of $1,600 each issued to Ray Gunderson and L. V. Halcomb for lease of 560 acres of land for 2 years.↩